USCA1 Opinion

 

 UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT _________________________ No. 94-2123 UNITED STATES OF AMERICA, Appellant, v. ANTHONY G. OLBRES and SHIRLEY A. OLBRES, Defendants, Appellees. __________________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW HAMPSHIRE [Hon. Steven J. McAuliffe, U.S. District Judge] ___________________ __________________________ Before Selya, Circuit Judge, _____________ Coffin, Senior Circuit Judge, ____________________ and Cyr, Circuit Judge. _____________ _________________________ Karen Quesnel, Attorney, Tax Division, United States Dep't _____________ of Justice, with whom Loretta C. Argrett, Assistant Attorney ___________________ General, Robert E. Lindsay and Alan Hechtkopf, Attorneys, Tax __________________ ______________ Division, and Paul M. Gagnon, United States Attorney, were on ______________ brief, for the United States. Terry Philip Segal, with whom Matthew H. Feinberg, Matthew ___________________ ____________________ _______ A. Kamholtz, Segal & Feinberg, Steven M. Gordon, and Shaheen, ___________ _________________ _________________ ________ Cappiello, Stein & Gordon were on joint brief, for appellees. _________________________ __________________________ July 26, 1995 __________________________   SELYA, Circuit Judge. In 1989, an employee of the SELYA, Circuit Judge. ______________ Internal Revenue Service (IRS) noticed a Rolls Royce belonging to the defendants, Anthony and Shirley Olbres, parked outside a restaurant in Exeter, New Hampshire. The presence of so opulent a vehicle in so bucolic a setting piqued the taxman's interest. He initiated an investigation that led, in succession, to an audit, an indictment, a trial, and a conviction for income tax evasion pursuant to a jury verdict.1 The district court then trumped the jury's verdict, granting the defendants' motions for judgments of acquittal. See United States v. Olbres, Cr. No. 93- ___ ______ ______ ______ 27-1-2-M (D.N.H. Sept. 30, 1994) (D. Ct. Op.).2 The government appeals. We reinstate the convictions. I. BACKGROUND I. BACKGROUND We start by relating certain (essentially uncontradicted) facts that serve to put the appeal into initial perspective. In 1974, the Olbreses he an industrial designer, she a schoolteacher destined to become a self-taught bookkeeper  launched a proprietorship, Design Consultants (DC), to conceive, construct, and erect exhibit booths for trade shows. At first,  ____________________ 1The statute of conviction provides in relevant part: Any person who willfully attempts in any manner to evade or defeat any tax imposed by [the Internal Revenue Code] or the payment thereof shall, in addition to other penalties provided by law, be guilty of a felony . . . 26 U.S.C. 7201 (1988). 2Although the district court's thoughtful opinion is unpublished, the interested reader can locate it at 1994 WL 543520. 2 the proprietors comprised the entire work force. The business grew steadily, and by 1987 DC employed 23 persons and had revenues in excess of $1,900,000. Despite the phenomenal growth of the business, Shirley Olbres continued to handle the books, toiling part-time, mostly at home. Her working materials consisted of an invoice log (in which she recorded bills sent and payments received), and three journals reflecting, respectively, cash receipts, cash disbursements, and petty cash. Beginning in 1976, the defendants retained the services of an accountant, Wilson Dennett. Dennett compiled income tax returns and financial statements, but did not perform bookkeeping or kindred services. He prepared the tax returns in reliance on information supplied by the defendants. For the tax year at issue on this appeal 1987 Shirley Olbres drafted a summary of the defendants' books and records for Dennett's use. She and her husband then met with Dennett to answer questions. When Dennett completed the return, the defendants came to his office and signed it. The defendants maintained various bank accounts during 1987. These included business checking and savings accounts at Indian Head Bank (IHB). Defendants deposited most of their business receipts into the business checking account, but occasionally deposited business receipts into the business savings account. While Shirley Olbres recorded all sums deposited into the business checking account in the cash receipts journal, she did not make comparable entries showing deposits 3 made to the business savings account. During the same time frame, the defendants also maintained payroll and petty cash accounts at a second bank, and a rent-receipts account in the name of Seabrook Properties at yet a third financial institution. The IRS started its investigation into the defendants' tax returns in 1989. Revenue Agent Leonard Kaply pulled the laboring oar. He determined, inter alia, that the defendants had _____ ____ substantially underreported their income on their joint federal income tax returns for the years 1986 through 1988. For 1987, Kaply's audit indicated that the defendants had failed to report nearly $750,000 in income from three sources: (1) business receipts deposited directly into the business savings account and not recorded in the cash receipts journal; (2) rebates from a transportation company that had contracted with DC to move trade show booths from place to place;3 and (3) certain income from rental property. In the course of the audit, the defendants gave Agent Kaply the cash receipts journal, but claimed to have misplaced the invoice log and the passbook for the business savings account (either of which would have revealed much of the unreported income). It was only when the IRS issued a summons to IHB that it discovered the business savings account, with its trove of unreported funds. The IRS concluded that the defendants willfully failed  ____________________ 3For no easily explicable reason, these rebates had been deposited into the Seabrook Properties account, omitted from the summary prepared by Mrs. Olbres for Dennett's use, and not mentioned in the defendants' ensuing dialogue with Dennett. 4 to report substantial amounts of income on their 1986, 1987, and 1988 federal tax returns ($150,954 in 1986, $748,991 in 1987, and $175,432 in 1988). The defendants conceded the underreporting, but denied criminal responsibility, saying that they lacked any intent to defraud.4 A federal grand jury returned a three-count indictment charging the defendants with willfully attempting to evade income tax for those three years. The case was tried to a jury. The defendants moved for judgments of acquittal at the end of the government's case, and again when both sides had rested. See Fed. R. Crim. P. 29(a). The district court denied the first ___ set of motions and reserved decision on the second set. See Fed. ___ R. Crim. P. 29(b). On January 24, 1994, the jury reached a split decision: it found the defendants not guilty on count 1 (1986) and count 3 (1988), but guilty on count 2 (1987). After a gestation period of nearly nine months, the district court, acting in pursuance of the earlier Rule 29(b) reservation, granted the defendants' motions for judgments of acquittal on count 2. The government then filed this timely appeal. II. ANALYSIS II. ANALYSIS Our analysis of this case is partitioned into three segments. First, we limn the standard of review. Second, we examine the elements of the offense of conviction and the sufficiency of the evidence. Third, we explain why we find the  ____________________ 4The defendants placed much of the onus on their accountant, Dennett, who died prior to the trial. For the most part, his knowledge of the facts died with him.  5 district court's analysis unpersuasive. A. Standard of Review. A. Standard of Review. __________________ Expressing the standard for judicial review of a claim of evidentiary insufficiency in a criminal case is a straightforward exercise. If the evidence presented, taken in the light most flattering to the prosecution, together with all reasonable inferences favorable to it, permits a rational jury to find each essential element of the crime charged beyond a reasonable doubt, then the evidence is legally sufficient. See ___ Jackson v. Virginia, 443 U.S. 307, 319 (1979); United States v. _______ ________ ______________ Gifford, 17 F.3d 462, 467 (1st Cir. 1994); United States v. _______ ______________ Castro-Lara, 970 F.2d 976, 979 (1st Cir. 1992), cert. denied, 113 ___________ _____ ______ S. Ct. 2935 (1993). In evaluating sufficiency, both direct and circumstantial evidence are accorded weight. See, e.g., United ___ ____ ______ States v. O'Brien, 14 F.3d 703, 706 (1st Cir. 1994). So long as ______ _______ the evidence, taken as a whole, warrants a judgment of conviction, "it need not rule out other hypotheses more congenial to a finding of innocence." Gifford, 17 F.3d at 467. _______ When, as now, a criminal defendant mounts a sufficiency challenge, all the evidence, direct and circumstantial, is to be viewed from the government's coign of vantage. Thus, the trial judge must resolve all evidentiary conflicts and credibility questions in the prosecution's favor; and, moreover, as among competing inferences, two or more of which are plausible, the judge must choose the inference that best fits the prosecution's theory of guilt. See United States v. Taylor, 54 F.3d 967, 974 ___ _____________ ______ 6 (1st Cir. 1995); United States v. Rothrock, 806 F.2d 318, 320 _____________ ________ (1st Cir. 1986). The granting of a motion for judgment of acquittal is subject to de novo review. See United States v. Kirvan, 997 F.2d __ ____ ___ _____________ ______ 963, 967 (1st Cir. 1993). Like the trial court, "we scrutinize the evidence in the light most compatible with the verdict, resolve all credibility disputes in the verdict's favor, and then reach a judgment about whether a rational jury could find guilt beyond a reasonable doubt." Taylor, 54 F.3d at 974. ______ B. Sufficiency of the Evidence. B. Sufficiency of the Evidence. ___________________________ In this instance, our assignment is simplified. Because the defendants do not dispute that they signed the 1987 tax return and that they substantially understated their income in the process, the question of guilt reduces to whether the underreporting occurred willfully, that is, whether it constituted "a voluntary, intentional violation of a known legal duty," United States v. Pomponio, 429 U.S. 10, 12 (1976) (per _____________ ________ curiam) (citations omitted). The trial focused on this narrow issue. The government contended that the defendants deliberately understated their 1987 income, while the defendants who claimed to have signed the return without reading it contended that they were guilty only of inadvertence, aggravated by the hiring of a maladroit accountant. In a tax evasion case in which the defendants assert that blind reliance on their accountant, not criminal intent, caused an underreporting, the critical datum is not whether the 7 defendants ordered the accountant to falsify the return, but, rather, whether the defendants knew when they signed the return that it understated their income. See Rothrock, 806 F.2d at 321. ___ ________ So here: if the evidence introduced at trial, taken in a pro- ________________ government light, permitted the jury to infer that the defendants ________________ (a) were aware of the contents of their return, and (b) knew that their reportable income significantly exceeded the income reflected therein, then the jury lawfully could find that the defendants acted willfully, and, hence, violated 26 U.S.C.  7201. See, e.g., United States v. Gaines, 690 F.2d 849, 855 ___ ____ ______________ ______ (11th Cir. 1982). We turn to this two-part inquiry, and then buttress the results with additional evidence of willfulness. 1. Knowledge of the Return's Contents. This facet of 1. Knowledge of the Return's Contents. __________________________________ the inquiry need not occupy us for long. A jury may permissibly infer that a taxpayer read his return and knew its contents from the bare fact that he signed it. See United States v. Drape, 668 ___ _____________ _____ F.2d 22, 26 (1st Cir. 1982) (holding that the defendant's signature on his return sufficed to establish knowledge of incorrect contents); United States v. Romanow, 505 F.2d 813, 814 _____________ _______ (1st Cir. 1974) (dismissing taxpayer's denial that he had read tax form, and stating that "it is clear that a jury could disbelieve him and conclude from nothing more than the presence of his uncontested signature that he had in fact read" the document). Here, moreover, the jury had before it other circumstantial evidence indicating that the defendants knew the 8 contents of their return. Dennett's wife, who worked with him, testified that when Dennett prepared a tax return for signature, the return was bundled into a packet with a cover sheet that summarized its contents. The bottom portion of the cover sheet contained the bill for the tax preparation services. The defendants testified that it was their habit to go to Dennett's office, sign the completed return, and pay the bill. The jury could reasonably infer that, in order to have paid the accountant's bill, the defendants must have read the portion of the cover sheet that detailed the return's contents. 2. Knowledge of the Understatement. The most 2. Knowledge of the Understatement. ___________________________________ compelling proof that the defendants knew that the figure reported on their 1987 return substantially understated their true income is the product of simple arithmetic. Tama Mitchell, a government witness, analyzed the defendants' 1987 return and found that the disposable funds available to them in that year, based on the information contained in the return, totalled $24,695. Mitchell further testified that the defendants made expenditures of more than $620,656 during the year.5 In the same period, their overall savings increased by $334,003. After subtracting net deposits of loan proceeds, Mitchell's analysis demonstrated that the defendants' combined expenditures and  ____________________ 5Mitchell's computations did not include all the defendants' annual expenditures, but established a baseline by concentrating on major cash purchases during the year, e.g., an outlay of ____ $158,000 in June to purchase a Rolls Royce Corniche convertible; an outlay of $32,450 in August to purchase a Range Rover; and an infusion of roughly $140,000 to a brokerage account. 9 accretions to savings in 1987 exceeded the cash available to them, according to their tax return, by $580,989. To be sure, the evidence pertaining to the defendants' lavish spending is circumstantial and suggestive, not direct and irrefutable. Yet, the arithmetic furnishes a sturdy infrastructure capable of supporting a reasonable inference that the defendants must have been aware that their 1987 return substantially underreported their income. See O'Brien, 14 F.3d ___ _______ at 706-07 (holding that, despite an absence of direct evidence, circumstantial evidence adequately supported jury's inference of guilty knowledge in fraud case); Castro-Lara, 970 F.2d at 981 ___________ (explaining that "circumstantial evidence, in and of itself, is often enough to ground a conviction"); United States v. Hurley, _____________ ______ 957 F.2d 1, 4 (1st Cir.) (stating that, in proving tax evasion, "the government [does] not need to show direct evidence of tax motivation" so long as the jury has a sufficient circumstantial basis for inferring willfulness), cert. denied, 113 S. Ct. 60 _____ ______ (1992). Even if one were to accept the defendants' self-serving hypothesis that the accountant's incompetence sparked the myriad misstatements embedded in the return, the jury could still reasonably infer that, when the defendants signed the return, they must have gained an awareness that the numbers could not possibly be accurate. See Gaines, 690 F.2d at 855 (holding that ___ ______ glaring inaccuracies in figures can support a reasonable inference of knowledge); see also Drape, 668 F.2d at 26 ("Intent ___ ____ _____ may be established where a taxpayer `chooses to keep himself 10 uninformed as to the full extent that [the return] is insufficient.'") (quoting Katz v. United States, 321 F.2d 7, 10 ____ _____________ (1st Cir.), cert. denied, 375 U.S. 903 (1963)). _____ ______ The proposition that the defendants knew their return understated their income derives support from other evidence as well. For example, during 1986, Anthony Olbres (who had unrestricted access to DC's books and records) provided fiscal and marketing information to Dennett so that the latter could prepare a financial statement in connection with a prospective sale of the business. When completed, the financial statement projected 1987 revenues in the amount of $1,976,000. The projection proved to be prophetic DC's actual 1987 gross receipts totalled $2,014,059 but the defendants reported gross receipts on the 1987 tax return in a far smaller amount ($1,265,069). Based on this progression of events, a rational jury could plausibly infer that Anthony Olbres had sufficient knowledge of DC's financial matters to recognize the huge discrepancy between projected revenues and reported revenues, and to appreciate the significance of the gap.6 Likewise, the jury  ____________________ 6The district court suggested that Anthony Olbres' participation in the preparation of the 1987 projections tended to be exculpatory rather than incriminatory, because it showed that the defendants reposed great confidence in their accountant. See D. Ct. Op. at 31. Though such an inference may be ___ permissible, it is not compelled; and, given the method of Rule 29, it is the jury's choice between alternative inferences, not the trial judge's choice, that must control. See O'Brien, 14 ___ _______ F.3d at 707 (warning that judges must not "usurp the jury's province" of choosing between alternative inferences); United ______ States v. Guerrero-Guerrero, 776 F.2d 1071, 1075 (1st Cir. 1985) ______ _________________ (similar), cert. denied, 475 U.S. 1029 (1986). _____ ______ 11 could infer from Shirley Olbres' position as DC's bookkeeper that she, too, must have recognized the massive understatement of income. 3. Other Evidence of Willfulness. In this case, the 3. Other Evidence of Willfulness. ______________________________ jury heard other evidence capable of supporting a permissible inference that the defendants acted willfully in underreporting their income. For one thing, the defendants themselves from time to time bypassed their business checking account and deposited substantial amounts of money (including approximately $145,000 in payments from a single customer, Digital Equipment Corp.) directly into their business savings account. They knew that these payments constituted income, yet they neither recorded them in the cash receipts journal nor reported them on their 1987 tax return. To make matters worse, the two source materials that most easily could have identified the unreported income the invoice log and the passbook for the business savings account  were withheld from the defendants' accountant; and, coincidentally, the same source materials conveniently disappeared during the IRS audit.7 While the defendants maintained other books and records from which the existence of these funds could perhaps be gleaned, see D. Ct. Op. at 31, it is ___ readily evident that a jury plausibly could infer from these facts that the defendants clumsily attempted to conceal income  ____________________ 7Joyce Wildes, a Dennett employee assigned to review the defendants' taxes, testified that she was not provided with either the log or the passbook, and Agent Kaply discovered the existence of the business savings account only by obtaining information directly from IHB. 12 from both their tax preparer and their government. Of course, the defendants' counter-argument that the evidence indicates nothing more than that they were remarkably slipshod in their business practices is also plausible. Withal, the option to choose between these inferences belonged to the jury, not the judge, see United States v. Guerrero-Guerrero, ___ _____________ _________________ 776 F.2d 1071, 1075 (1st Cir. 1985), cert. denied, 475 U.S. 1029 _____ ______ (1986), and the jury had a perfect right to reject the defendants' counter-argument and draw the inference urged by the government. See O'Brien, 14 F.3d at 707; United States v. ___ _______ ______________ Quejada-Zurique, 708 F.2d 857, 859 (1st Cir.), cert. denied, 464 _______________ _____ ______ U.S. 855 (1983). After all, "if the evidence can be construed in various reasonable alternatives, the jury is entitled to freely choose from among them." United States v. Smith, 680 F.2d 255, _____________ _____ 259 (1st Cir. 1982), cert. denied, 459 U.S. 1110 (1983). _____ ______ The evidence anent the defendants' income from rental property also bolstered the inference of willfulness. During 1987, the defendants owned various properties and rented them to tenants. In 1987, Johnson Matthey Catalog Company (J/M) rented space from the defendants in Seabrook, New Hampshire, at a rate of $48,000 per annum. J/M sent a $4,000 rent check to the defendants' home every month. Shirley Olbres deposited each rent check, when received, into the Seabrook Properties account. Although J/M paid the full $48,000 during 1987, the defendants informed Dennett that they had garnered only $30,000 in rental income from all their real estate. Thus, their 1987 return 13 failed to include $18,000 from the avails of the J/M tenancy, and also failed to include $3,890 in rental income referable to a property known as "the barn." It is beyond serious question that the defendants' action in pegging the J/M lease proceeds at $30,000 in the summary they gave to their accountant, coupled with their failure to list any rental income referable to the ___ barn, could ground the requisite inference of criminal intent. We think, too, that the defendants' failure to report sums received as rebates from Mayflower Transit Company (Mayflower) gives rise to a founded inference of willfulness. DC retained Mayflower to ferry exhibit booths to and from trade shows. The contract between the parties stipulated that Mayflower would furnish transportation services to DC at customary tariff rates, but then remit 20% of the amounts actually paid. The rebate would be calculated monthly, based on payments from DC to Mayflower. Pursuant to this arrangement, Mayflower remitted $96,671 in 1987, but, for some reason, failed to issue a 1099 form memorializing the payments. The defendants did not report any of this money as income on their 1987 return (despite the fact that they deducted 100% of the tariff charges that they paid in the first instance). Shirley Olbres deposited each of the eleven rebate checks that DC received from Mayflower during the year into the Seabrook Properties account even though that account had no direct connection with DC or its business. At trial, she testified that she did not know that the rebates constituted 14 income. Her husband, however, admitted that he was aware of the rebates' taxable character. We believe that, on this record, a rational jury could infer that the concealment of the rebates resulted not from ignorance or inadvertence but from a conscious decision on the defendants' part to take criminal advantage of Mayflower's failure to issue the required 1099 form. 4. Recapitulation. To sum up, the record, read 4. Recapitulation. ______________ favorably to the verdict, supports the following findings: (1) the defendants signed the 1987 tax return; (2) they knew the contents of the return at the time they signed it, and they knew that it significantly understated their taxable income; (3) they knew their business had made substantially more money than the return reflected; (4) they had received revenues during the tax year which they knew were taxable, such as business receipts and transportation rebates, yet they neither deposited those revenues in the business checking account nor recorded their receipt in the usual manner, but, instead, diverted the revenues to other bank accounts; (5) they deliberately understated the amounts of rental income received when transmitting data to their accountant preliminary to the accountant's preparation of their tax return; and (6) they withheld materials from the accountant (and, later, from the IRS auditor) that would have pointed to the existence and extent of the undeclared income. Notwithstanding the defendants' denials and regardless of the exculpatory evidence that lurked in the record, these findings enabled a rational jury to conclude, beyond a reasonable doubt, that the defendants were 15 guilty of income tax evasion for the year 1987. C. The Judgment of Acquittal. C. The Judgment of Acquittal. _________________________ The district court, steadfast in its desire to ensure the integrity of the reasonable doubt standard, undertook a painstakingly thorough examination of the record. The court conceded that the government's case was not "unpersuasive," D. Ct. Op. at 35, that a jury "could rationally reach" the __________ conclusion that the defendants willfully attempted to defraud the government in respect to their 1987 taxes, id., and that, if the ___ court were to determine the existence of willfulness by means of a preponderance test, it would find for the government, see id. ___ ___ at 37. Nevertheless, the court entered judgment notwithstanding the verdict on the ground that the proof did not permit a finding, beyond a reasonable doubt, that the defendants willfully filed a false tax return. To the court's way of thinking, the defendants had articulated a "hypothesis of innocence (negligence, incompetence, inattention, and reasonable reliance on the family's long-time certified public accountant) . . . [that was] sufficiently reasonable and sufficiently strong and sufficiently credible that a rational trier of fact . . . must necessarily entertain a reasonable doubt about defendants' guilt . . . ." Id. at 37-38. ___ Our independent review of the record convinces us that the court, while giving lip service to the "viewpoint" principle (which holds that the evidence must be viewed, for the purpose of an acquittal motion, in the light most flattering to the 16 government), subverted the principle by isolating each piece of evidence and determining whether that evidence, standing alone, gave rise to a powerful enough inference of willfulness to allay any reasonable doubt about the defendants' guilt. In the bargain, the court appears to have misunderstood the interplay between the viewpoint principle and the reasonable doubt standard. The lower court's handling of the rent-receipts evidence illustrates our concerns. In discussing this evidence, the court acknowledged that an inference adverse to the defendants could rationally be drawn, but concluded that this inference was not "of sufficient persuasive value to establish [the defendants'] knowing intent to evade taxes, beyond a reasonable doubt." D. Ct. Op. at 33. But few, if any, circumstantial evidence cases can survive this sort of balkanization. For purposes of Rule 29, a broader perspective must be employed to gauge the prosecution's mettle. Under the viewpoint principle, a jury charged with determining an accused's guilt or innocence is entitled to consider the evidence as a seamless whole. Jurors are "not required to examine the evidence in isolation, for `individual pieces of evidence, insufficient in themselves to prove a point, may in cumulation prove it. The sum of an evidentiary presentation may well be greater than its constituent parts.'" United States v. Ortiz, 966 F.2d 707, 711 ______________ _____ (1st Cir. 1992) (quoting Bourjaily v. United States, 483 U.S. _________ ______________ 171, 179-80 (1987)), cert. denied, 113 S. Ct. 1005 (1993). Here, _____ ______ 17 though no one piece of evidence laid bare the defendants' intent, the aggregate evidence, taken most hospitably to the prosecution (as the viewpoint principle demands), was equal to the task. The lower court's treatment of the evidence anent transportation rebates illustrates another (related) shortcoming in the court's inchmeal approach to evidentiary sufficiency: the court not only took each piece of evidence in isolation, but weighed the several possible inferences associated with each piece, and chose between them. Thus, while the judge acknowledged that the jury could rationally infer criminal intent in connection with Shirley Olbres' handling of the transportation rebates,8 he posited that Mrs. Olbres, as an "unschooled lay person," might well have misconstrued the rebates as something other than income. D. Ct. Op. at 34. By umpiring the duel between two competing inferences and declaring the winner on the basis of which inference appeared more robust in his eyes, the judge invaded the jury's province. On a motion for judgment of acquittal unlike, say, on a motion for a new trial9 it is for the jury, not the court, to choose between conflicting inferences. In Jackson, the _______ Supreme Court stated that a court "faced with a record of historical facts that supports conflicting inferences must  ____________________ 8The district court conceded that the evidence could sustain an inference that Shirley Olbres knew the rebate checks were taxable income, but attempted to hide them, thereby taking advantage of Mayflower's failure to report the payments to the IRS on the required form. See D. Ct. Op. at 34. ___ 9The defendants did not move for a new trial in this case. 18 presume even if it does not affirmatively appear in the record that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." 443 U.S. at 326. Under this directive, the judge's failure to defer to the permissible inference of willfulness arising out of, inter alia, _____ ____ the defendants' failure to report the rebate checks constitutes error. There is still another aspect of the district court's methodology that bears correction. In finding the proof insufficient to convict, the court cited, and relied upon, a statement to the effect "that if a hypothesis of innocence is sufficiently reasonable and sufficiently strong, then a reasonable trier of fact must necessarily entertain a reasonable ____ doubt." United States v. Bell, 678 F.2d 547, 550 (5th Cir. 1982) _____________ ____ (en banc) (Anderson, J., concurring) (internal citation and quotation marks omitted), aff'd on other grounds, 462 U.S. 356 _______________________ (1983). Even apart from a citation error,10 this stripped-down formulation, without more, comprises a misleading statement of the law. Its principal vice is that it is incomplete. The quoted text fails to reflect a core element of the viewpoint principle: the necessity of drawing inferences hospitable to the government's theory of the case before judging the strength of ______ any proffered hypothesis of innocence. We explain briefly. In analyzing a motion for judgment of acquittal, a  ____________________ 10The district court incorrectly attributed this language to the Bell majority. See D. Ct. Op. at 20.  ____ ___ 19 court is obliged to take, and then to scrutinize, a snapshot of the case but, as we have made clear on other occasions,11 the snapshot only can be taken after focusing the lens of inquiry at an angle favorable to the prosecution. The district court neglected this focus. It took the snapshot head-on (as a judge would do if presiding over a bench trial). Consequently, the court acknowledged that inferences of willfulness could plausibly be drawn from much of the evidence, but, instead of crediting those inferences and then confronting the question of evidentiary sufficiency, the court simply placed the inculpatory inferences on an equal footing with various exculpatory inferences and proceeded to weigh this mixed bag. In other words, the court neither deferred to the jury's presumed choice of alternative inferences, see Jackson, 443 U.S. at 326, nor evaluated the ___ _______ potency of the defendants' hypothesis of innocence in light of ____________ those presumed choices. This improper focus emptied the ________________________  ____________________ 11See, e.g., United States v. Flores-Rivera, __ F.3d ___ ___ ____ ______________ _____________ (1st Cir. 1995) [No. 93-1558]: [I]f the evidence viewed in the light most favorable to the verdict gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence of the crime charged, this court must reverse the conviction. This is so because . . . where an equal or nearly equal theory of guilt and a theory of evidence is supported by the evidence viewed in the light most favorable to the prosecution, a reasonable jury must necessarily entertain a reasonable doubt. Id. at ___ [slip op. at 5] (quoting United States v. Sanchez, 961 ___ _____________ _______ F.2d 1169, 1173 (5th Cir.), cert. denied, 113 S. Ct. 330 (1992)). _____ ______ 20 viewpoint principle of its essential meaning (causing the court to usurp the jury's function) and produced a snapshot that distorted, rather than accurately depicted, the Rule 29 record. III. CONCLUSION III. CONCLUSION We need go no further. It is trite, but true, that a court "ought not disturb, on the ground of insufficient evidence, a jury verdict that is supported by a plausible rendition of the record." Ortiz, 966 F.2d at 711. While there may well be cases _____ in which the government's proof founders in the "realm between preponderance and `beyond reasonable doubt,'" D. Ct. Op. at 22, see also Hon. Jon O. Newman, Beyond "Reasonable Doubt", 68 N.Y.U. ___ ____ _________________________ L. Rev. 979, 986-88 (1993) (criticizing the perceived toothlessness of appellate application of the reasonable doubt standard in review of evidentiary insufficiency claims), this case is not of that genre. To the contrary, this case evokes our frequently reiterated rule that: [I]n a criminal case, "the evidence need not preclude every reasonable hypothesis inconsistent with guilt" in order to sustain a conviction. It is enough that . . . a rational jury could look objectively at the proof and supportably conclude beyond reasonable doubt that the defendant's guilt had been established. United States v. Ingraham, 832 F.2d 229, 239-40 (1st Cir. 1987) _____________ ________ (internal citation omitted), cert. denied, 486 U.S. 1009 (1988). _____ ______ Because our perscrutation of the record convinces us that, in mulling the issue of intent, the district court both misapplied the appropriate legal standard and undervalued the force of the government's overall proof, the judgment below must be 21 Reversed. Reversed. ________ 22