# United States Court of Appeals
## For the First Circuit

No. 02-1035

UNITED STATES OF AMERICA,

Appellee,

v.

LISA A. BOULERICE,

Defendant, Appellant.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Michael A. Ponsor, U.S. District Judge]

Before

Selya, Circuit Judge,
Stahl, Senior Circuit Judge,
and Lipez, Circuit Judge.

Lori H. Levinson, with whom Cain Hibbard Myers & Cook, P.C. was on brief, for appellant.

Thomas J. O'Connor, Assistant United States Attorney, with whom Michael J. Sullivan, United States Attorney, was on brief, for appellee.

April 14, 2003

**LIPEZ, Circuit Judge.** Defendant-appellant Lisa A. Boulerice appeals from a judgment of conviction following a jury trial in which she was found guilty of having filed false income tax returns for 1993 and 1994 in violation of 26 U.S.C. § 7206(1). On appeal Boulerice claims that there was insufficient evidence to support the findings of guilt, and that the district court therefore erred in denying her Rule 29 motion for judgment of acquittal. See Fed. R. Crim. P. 29. She also claims that the district court improperly admitted evidence of prior bad acts, and that the court abused its discretion when it declined to grant a request from the jury to read back testimony. Finally, Boulerice argues that the prosecutor's closing argument impermissibly shifted the burden of proof to her, thereby violating her due process rights. Discerning no reversible error in any of these claims, we affirm.

## I.  Background

This case arose out of an investigation by the Internal Revenue Service ("IRS") and the United States Postal Inspection Service ("USPIS") into the suspected criminal activities of American Inventor's Corporation ("AIC") and Massachusetts Patent Services ("MPS"), entities owned and controlled by Lisa Boulerice's father, Ronald Boulerice.[1]  AIC and MPS were ostensibly in the

---

[1] For convenience, we refer to Lisa Boulerice as "Lisa" or "Boulerice," and Ronald Boulerice as "Ronald."

business of helping inventors secure patents for their inventions, when in fact the companies did little more than bilk the inventors out of their money. In 1995, acting on the complaints of numerous AIC and MPS clients, the USPIS launched an inquiry into the activities of AIC and MPS. This investigation ultimately led to the execution of search warrants in October 1995 at the companies' places of business in Westfield, Massachusetts, and the subsequent indictment of Ronald and eight other individuals for numerous offenses, including mail fraud, conspiracy to commit mail fraud, money laundering, conspiracy to commit money laundering, filing false income tax returns, and conspiracy to defraud the United States. Ronald ultimately pleaded guilty to several of the charges[2] and was sentenced to ninety-six months' imprisonment. He was also ordered to pay $2.2 million in restitution and $7.3 million in fines.

The government's investigation into Ronald also unearthed evidence of wrongdoing on the part of his daughter Lisa, the appellant in this case. The government discovered that Lisa had been on the payroll of MPS and AIC for several years. During that time, she accepted and cashed paychecks from AIC and MPS, claiming these proceeds as "wages" on her 1991-1994 tax returns — even though she had done no work for the two companies. Indeed, during

---

[2] Ronald Boulerice pleaded guilty to one count of mail fraud, one count of conspiracy to commit mail fraud, two counts of money laundering, and one count of filing a false tax return.

the period at issue, Lisa was pursuing her own career as a fashion designer in New York City, living in an expensive apartment on the city's Upper East Side.  AIC paid for this apartment, deducting the cost as a business expense on its income tax returns.  The government also uncovered evidence that, in response to a 1992 IRS audit of AIC, Lisa had backdated two job description forms, falsely detailing her supposed duties as an AIC employee.

On April 15, 1999, a grand jury sitting in Springfield, Massachusetts, returned a four-count indictment against Lisa, charging her with one count of conspiracy to defraud the United States, in violation of 18 U.S.C. § 371, and three counts of filing false income tax returns for 1992, 1993, and 1994, in violation of 26 U.S.C. § 7206(1).  On August 1, 2001, the district court commenced a jury trial, and on August 10, 2001, the jury found Boulerice guilty of filing false income tax returns for 1993 and 1994, but acquitted her of the other two counts (conspiracy and filing a false tax return for 1992).  The district court sentenced Boulerice to a term of two years' probation.  This appeal ensued.

## II.  The Rule 29 Motion

Boulerice argues that the evidence at trial "fell far short of proving that when she submitted IRS Form 1040s for 1993 and 1994, she willfully made false statements with the intent of violating her duty under the tax laws."  Thus, she claims, the district court erred in denying her Rule 29 motion for judgment of

acquittal.  See Fed. R. Crim. P. 29(a) (indicating that court must enter judgment of acquittal "if the evidence is insufficient to sustain a conviction of such offense or offenses").  Our review of the district court's ruling is de novo.  United States v. Carroll, 105 F.3d 740, 742 (1st Cir. 1997).  We will affirm the conviction if, "after assaying all the evidence in the light most amiable to the government, and taking all reasonable inferences in its favor, a rational factfinder could find, beyond a reasonable doubt, that the prosecution successfully proved the essential elements of the crime."  United States v. O'Brien, 14 F.3d 703, 706 (1st Cir. 1994).  We need not be convinced that the government succeeded in "eliminating every possible theory consistent with the defendant's innocence."  United States v. Moran, 312 F.3d 480, 487 (1st Cir. 2002).  Rather, we simply consider "all the evidence, direct and circumstantial, and resolve all evidentiary conflicts in favor of the verdict."  United States v. Hernandez, 146 F.3d 30, 32 (1st Cir. 1998).  We will affirm if "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  Jackson v. Virginia, 443 U.S. 307, 319 (1979).

The jury found Boulerice guilty of two counts of violating 26 U.S.C. § 7206, which provides:

Any person who —

**(1) Declaration under penalties of perjury.** — Willfully makes and subscribes any return, statement, or other document, which contains or is verified by a written declaration that

-5-

it is made under the penalties of perjury, and which he does not believe to be true and correct as to every material matter

. . . .

shall be guilty of a felony and, upon conviction thereof, shall be fined not more than $100,000 ($500,000 in the case of a corporation), or imprisoned not more than 3 years, or both, together with the costs of prosecution.

As the verdict forms make clear, the jury found Boulerice "guilty of willfully filing a false 1993 tax return" and "guilty of willfully filing a false 1994 tax return."

We take this opportunity to clarify the government's burden under 26 U.S.C. § 7206(1). The elements of an offense under 26 U.S.C. § 7206(1) are

(1) that the defendant made or caused to be made, a federal income tax return for the year in question which he verified to be true; (2) that the tax return was false as to a material matter; (3) that the defendant signed the return willfully and knowing it was false; and (4) that the return contained a written declaration that it was made under the penalty of perjury.

United States v. LaSpina, 299 F.3d 165, 179 (2d Cir. 2002) (quoting United States v. Pirro, 212 F.3d 86, 89 (2d Cir. 2000) (quoting United States v. Peters, 153 F.3d 445, 461 (7th Cir. 1998))); see also United States v. Scholl, 166 F.3d 964, 979 (9th Cir. 1999). Boulerice concedes that she filed the returns, and she does not challenge the materiality of the false statements. She also does not contend that the tax returns failed to include the required

-6-

declaration. Boulerice does maintain, however, that the government failed to demonstrate that she willfully violated the statute. She also asserts that the government failed to demonstrate that she had actual knowledge of the returns' material falsity. We address these two contentions in turn.

## A. Willfulness

Boulerice insists that the government "failed to establish beyond a reasonable doubt that [she] acted willfully when she filed her income tax returns for 1993 and 1994." At trial, Boulerice took the stand in her own defense, testifying that she held an honest belief that she was required by law to file an income tax return for money that she had received from her father's corporation. She maintained that she was only doing what her accountant told her to do — file tax returns which reflected the "wages" she received from AIC and MPS. Therefore, the argument goes, the government failed to demonstrate willfulness as required by the statute. See 26 U.S.C. § 7206(1) ("Any person who willfully . . . .") (emphasis added).

We have previously indicated that "willfully," as that word is used in 26 U.S.C. §§ 7201-7207, means "a voluntary, intentional violation of a known legal duty." United States v. Monteiro, 871 F.2d 204, 209 (1st Cir. 1989) (citing Drape, 668 F.2d at 26). The government need not present direct evidence of willfulness; rather, circumstantial evidence of willfulness can be

sufficient to sustain a conviction.  Id. at 211; see also United States v. Olbres, 61 F.3d 967, 971 (1st Cir. 1995) ("[I]n proving tax evasion, 'the government does not need to show direct evidence of tax motivation' so long as the jury has a sufficient circumstantial basis for inferring willfulness.") (quoting United States v. Hurley, 957 F.2d 1, 4 (1st Cir. 1992)).

Our decision in Olbres is illuminating.  Having been convicted of tax evasion under 26 U.S.C. § 7201, the defendants maintained on appeal that the government had not presented sufficient evidence of willfulness to sustain the verdict.  They asserted that blind reliance on their accountant, and not willfulness or criminal intent, caused an underreporting of income.  Olbres, 61 F.3d at 970.  In rejecting their argument, we indicated that "the critical datum is not whether the defendants ordered the accountant to falsify the return, but, rather, whether the defendants knew when they signed the return that it understated their income."  Id. at 970-71.  Moreover, "[a] jury may permissibly infer that a taxpayer read his return and knew its contents from the bare fact that he signed it."  Id. at 971; see also Drape, 668 F.2d at 26 (holding that defendant's signature on tax return sufficed to establish knowledge of incorrect contents); United States v. Romanow, 509 F.2d 26, 27 (1st Cir. 1975) (holding that "jury could conclude from nothing more than the presence of [defendant's] uncontested signature" that violation was willful).

Hence, in Boulerice's case, the government need only have presented sufficient evidence for the jury to conclude that when Boulerice signed her tax returns, those returns were not "true and correct as to every material matter." 26 U.S.C. § 7206(1). The jury was then permitted (though by no means required) to infer willfulness.

At trial, however, the government elicited significantly more evidence of willfulness than Boulerice's signature on two false returns. Under cross-examination, Boulerice admitted that she knew that "wages" means income one earns by working, and she also admitted that she had never worked at AIC or MPS. Nevertheless, on her tax returns she claimed as "wages" the money she received from AIC and MPS. Moreover, Marvin Kennedy, AIC's former accountant, testified for the government that in 1992 Boulerice had voiced concerns about the propriety of receiving payroll checks from the companies when she was not actually working for them. Because of her unease, she wanted to know how she could "eradicate" [sic] herself from the situation. When Kennedy responded that her only option would be to forego further disbursements, Boulerice decided to remain on the payroll.

The government also produced evidence that, in response to an IRS audit of AIC, Boulerice signed and backdated phony job descriptions that falsely held her out as an employee of AIC. In June 1992, the IRS auditor asked AIC to produce more information about Boulerice's employment duties and the rent payments for her

New York City apartment, which AIC had been deducting as a business expense. Laurie O'Brien, a vice-president of AIC, testified that she sent Boulerice two job description forms falsely detailing Boulerice's duties as an employee with the company. Each form was accompanied by a note: One was dated "7/10/92" and instructed Boulerice to "sign and date using date of 6/2/88," and the other was dated "7/11/92" and informed Boulerice that she should sign using the "date of 5/23/90. This is for audit." Boulerice signed the forms as requested and returned them to O'Brien.

Boulerice's misrepresentations did not end there. Postal Inspector Gerry Carmody testified that Boulerice continued to hold herself out as an employee of AIC as late as 1996. In May of that year, as a result of the criminal investigations into AIC and MPS, Carmody interviewed Boulerice concerning her relationship with the companies. When he asked her if she was an employee of AIC, she responded in a "curt" and "annoyed" manner that she was. After answering that question, Boulerice terminated the interview, telling Carmody that she wanted to speak to her father before answering any more questions.

Finally, while Boulerice insists that she had only "rudimentary" knowledge of her obligations under the tax code, the government produced evidence that Boulerice was not altogether unsophisticated. For example, in 1991 Boulerice provided her tax preparer with check stubs documenting income from her freelance

work, together with a note revealing that she understood that those payments had to be included in her returns. This, when combined with Boulerice's testimony that she understood that "wages" meant money actually earned from working, supports an inference that Boulerice knew that the line "wages, salaries, tips, etc." on her tax returns did not merely mean the dollar amounts contained in Box #1 of her W-2 forms, but that it meant income actually earned from work.

In light of the foregoing, we conclude that there was ample evidence to support the jury's finding that Boulerice willfully filed tax returns that she knew to be false. The jury reasonably could have found that Boulerice knew of her obligation to accurately report her income, she knew that the money she was receiving from AIC and MPS was not "wages," and she repeatedly attempted to cover up the truth about her relationship with AIC and MPS. She nevertheless reported as "wages" on her tax returns the money she received from AIC and MPS. We will not disturb the jury's verdict.

## B. Actual Knowledge of Material Falsity

In her opening brief, Boulerice also claims that the district court erred in denying her Rule 29 motion because there was "no evidence that Boulerice 'actually knew' the return[s] [were] materially false" when she filed them. She asserts that the government was required to prove that she knew her father was

deducting her "wages" as a business expense on his corporate income tax returns.  Since the government did not do so, she maintains, she is entitled to judgment of acquittal.

This assignment of error has no basis in law.  Although the government had to prove to the jury the materiality of Boulerice's false statements, the government did not have to prove her knowledge of the materiality.[3]  See LaSpina, 299 F.3d at 179; Drape, 668 F.2d at 25-26; cf. United States v. Notarantonio, 758 F.2d 777, 785 n.4 (1st Cir. 1985) (holding that in prosecution under 18 U.S.C. § 1001, "knowledge" is assessed "with respect to the defendant's knowledge of the falsity of the statements rather than with respect to the defendant's knowledge of the statement's materiality to the federal agency involved").  Hence, whether Boulerice actually knew of the false statements' materiality to the government does not enter the calculus of proof.[4]

_____

[3] A "material" matter is one that is likely to affect the calculation of tax due and payable, or to affect or influence the IRS in carrying out the functions committed to it by law, such as monitoring and verifying tax liability.  See DiRico, 78 F.3d at 735-36.  As indicated previously, Boulerice does not challenge on appeal the materiality of the false statements.

[4] At one point in the instructions, the district court instructed the jurors that the government had to prove that "Boulerice herself actually knew the return was materially false." This, as explained in the text, overstates the government's burden. Elsewhere in its instructions, however, the court more accurately instructed that "the defendant must be proved to have known that material statements in the return were false" and that she "in fact did not believe the return was true and correct in every material matter."  We do not believe that, taken as a whole, these instructions confused or misled the jury.  See United States v.

-12-

### III.  The Admission of Evidence of Unreported
### Freelance Income as "Other Bad Act" Evidence

At trial, the government, without objection, cross-examined Boulerice concerning her failure to report freelance income to the IRS after 1992.  Boulerice now claims that this "extrinsic evidence," as she describes it,[5] was highly prejudicial "other bad act" evidence offered to show criminal propensity without serving another legitimate purpose, in violation of Federal Rules of Evidence 404(b) and 403.[6]

---

Smith, 278 F.3d 33, 38 (1st Cir. 2002).

[5] "Extrinsic evidence" is evidence of specific instances of conduct "not relevant in the litigation to establish a fact of consequence," i.e., evidence of a "collateral matter."  United States v. Andujar, 49 F.3d 16, 26 (1st Cir. 1995).  Testimony elicited under cross-examination, however, is not actually "extrinsic."  See 4 Jack B. Weinstein & Margaret A. Berger, Weinstein's Federal Evidence, § 608.20[1] (Joseph M. McLaughlin, ed., Matthew Bender 2d ed. (2003))("Evidence is 'extrinsic' if offered through documents or other witnesses, rather than through cross-examination of the witness himself or herself.").

[6] Rule 404(b) provides, in pertinent part:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith.  It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial . . . of the general nature of any such evidence it intends to introduce at trial.

Fed. R. Evid. 404(b).  Under Rule 403, relevant evidence may be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or

-13-

The government responds with a number of theories of admissibility. We need not dwell at length on any of them, however, for two reasons. First, since Boulerice failed to object below, we review only for plain error. United States v. Olano, 507 U.S. 725, 733 (1993); United States v. Baldyga, 233 F.3d 674, 684 n.11 (1st Cir. 2000). Under this standard, we will disregard the purported error unless "a miscarriage of justice would otherwise result," or if the error "seriously affects the fairness, integrity or public reputation of [the] judicial proceedings." Olano, 507 U.S. at 736. Second, the government had already introduced evidence of Boulerice's unreported freelance income, without objection, during its case-in-chief, precluding any argument that this cross-examination affected Boulerice's substantial rights. See Fed. R. Crim. P. 52(a).

Among the witnesses called by the government was Marvin Kennedy, the AIC accountant who assisted with the preparation of Boulerice's 1991 and 1992 tax returns and who testified that Boulerice had provided him with receipts for freelance income which he included on her returns for those years. Thereafter, the government elicited testimony from Michael Barret, the AIC accountant who assisted with the preparation of Boulerice's 1993 and 1994 tax returns, that Boulerice did not claim any freelance income during those two years. When the government asked Barret if

needless presentation of cumulative evidence." Fed. R. Evid. 403.

-14-

he would have included freelance income had Boulerice provided documentation of any, Boulerice objected to the question as "calls for speculation."[7] The objection was overruled. Subsequently, the government — without objection from Boulerice — introduced evidence of paid freelance work performed by Boulerice in 1993 and 1994 through, among other things, the testimony of Boulerice's employers.

When Boulerice took the stand, the government first cross-examined her about her knowledge of her responsibilities under the tax code:

> Q:   And you know what wages are, for example? You know what that is, don't you?
> A:   What you make.
> Q:   And it's what you make when you work, correct?
> A:   Correct.
> Q:   And you knew that wages have to be reported accurately to the Internal Revenue Service, isn't that correct?
> A:   Yes.
> . . . .
> Q:   You knew you had to report the figure on the income tax return accurately and

---

[7] The district court, overruling Boulerice's "speculation" objection, nevertheless sua sponte raised the issue of other bad act evidence, expressing a concern that the government was perhaps trying to elicit inadmissible "propensity evidence." The government responded that the evidence went to Boulerice's intent, particularly her knowledge of her responsibilities under the tax laws. Boulerice essentially repeated her speculation objection. The court then indicated that, "to the extent this is evidence of some sort of bad act, I think it is relevant on the issue of intent and I don't think that its probative value is outweighed by any prejudicial value."

                          truthfully and correctly, isn't that
                          correct?
              A:          Yes.


Boulerice then testified that she had assisted her accountant in

the preparation of her tax returns:

              Q:          And you recall that you would send him
                          information to assist him in reporting
                          accurately all your income; do you
                          recall doing that?
              A:          I believe I did.

At this point the government began to cross-examine Boulerice about

her various freelance jobs, the income she received from those

jobs, and her failure to report that income on her tax returns.

Under this questioning, Boulerice admitted to having failed to

report significant freelance income on her tax returns.

         Boulerice contests on appeal only this cross-examination

and not the evidence of her unreported freelance income admitted

during the government's case-in-chief.  Hence we need not address

the government's theories regarding the propriety of the cross-

examination.   Since the jury had already heard evidence of

Boulerice's unreported freelance income without objection,

Boulerice cannot be heard to complain that her cross-examination

regarding the same was unfairly prejudicial.  See United States v.

Perrotta, 289 F.3d 155, 165 (1st Cir. 2002); Doty v. Sewall, 908

F.2d 1053, 1057 (1st Cir. 1990); Lacy v. Gardino, 791 F.2d 980, 986

(1st Cir. 1986).  Thus, we conclude that the district court did not

plainly err in indulging the cross-examination.

## IV.  The Failure to Read Back Testimony

At the start of its second day of deliberations, the jury submitted a note to the court stating that the jury "would like to listen to the testimony of Marvin Kennedy."  Assuming that the jury was asking the court to read back the testimony of Kennedy in its entirety, the court (outside the presence of the jury) informed counsel:  "I don't do that.  I've never done it before."  The court continued:

> I'll certainly hear you before I make my final decision but it's been my practice in the past not to do that for two reasons. First, I don't think we have a transcript of the testimony of Marvin Kennedy.  We have the notes.  We have the stenographic notes from which a transcript could be prepared, but I don't believe that we have a transcript of Mr. Kennedy's testimony.
>
> . . . .
>
> Even if we did, I would hesitate to read it to them.  It would tend to put, I believe, or at least would have the potential for putting undue emphasis on Mr. Kennedy's testimony in contrast to the testimony of Mr. Barrett or the testimony of the defendant or whatever.  And so if I was going to do it, I would probably have to consider doing all the witnesses' testimony as well so there won't be any imbalance.
>
> I'm sure it's frustrating to the jury to be told that they're not going to get what they're asking for, but this is what I've done in the past and this is what I am inclined to do in this case.
>
> Before I make my final decision, I'd be happy to hear from counsel.

Counsel for Boulerice then stated:

> Well, I do know that from some past experience in other courts, the court reporter has read from the stenographic notes the testimony of the witness. Short of that, I would have no other possible suggestions, Your Honor.

The court then reiterated its concern that, even assuming an accurate transcript could be quickly assembled, there would still be the risk of inappropriately highlighting the testimony of Kennedy. After hearing from the prosecutor, who voiced his opposition to any read back, the court indicated that it would not read back the testimony.

Boulerice now assigns error to this decision. A district court's decision not to read back testimony is reviewed only for abuse of discretion. United States v. Akitoye, 923 F.2d 221, 226 (1st Cir. 1991). We find no abuse of discretion here.

Before the district court, Boulerice's counsel offered only one justification for reading back the testimony: other courts in which she has appeared have read back testimony. She failed, however, to respond to the two concerns articulated by the district court, both of which we have held to be valid considerations. See United States v. Aubin, 961 F.2d 980, 983 (1st Cir. 1992) (indicating that "risk of confusion" and "difficulty in compliance" are proper considerations in ruling on request for read back of testimony).

Belatedly, Boulerice now maintains that of all the witnesses, Kennedy was "the crucial one," that Kennedy's testimony was short and consisted of "only" seventy pages of trial transcript, and that the court reporter was capable of accurately reading back from her stenographic notes. Whatever the merits of any of these arguments, they do not alter our conclusion that the district court acted well within its discretion in denying the read back.

Boulerice also complains that the district court did not actually exercise any discretion in deciding not to read back the testimony. She claims that the district court, in a "knee-jerk reaction," summarily dismissed the jury's request, without engaging in the thoughtful balancing of interests which normally goes into the exercise of a court's sound discretion. We disagree. While the district court did initially indicate its reluctance to read back the testimony ("I don't do that. I've never done that before."), it subsequently explained why it was inclined to deny the jury's request. The court then gave counsel the opportunity to be heard and to present any counter-arguments before making a final decision. Only then did the district court render its final decision. We therefore reject Boulerice's claim that the district court failed to engage in the proper analysis.

## V.  The Prosecutor's Closing Argument

Boulerice's final claim of error concerns three statements made by the prosecutor during closing argument — only one of which elicited an objection from Boulerice. Boulerice claims that these statements "improperly shifted the burden of proof to the defendant." We disagree.

Part of Boulerice's defense theory hinged on her relationship with her father. In an effort to defeat the government's conspiracy charge, Boulerice claimed that she had an abusive relationship with her father and that she was in such fear of him that there was no way she could turn down the money that he sent her through MPS and AIC. She unquestioningly accepted the payments from him because she was afraid to inquire about their source and thereby risk incurring his wrath. Thus, she argued, there was no conspiracy to defraud the United States.[8]

The only witness to testify to this allegedly difficult father-daughter relationship was Lisa Boulerice herself. In closing argument, the prosecutor commented on this fact:

> And one of the things about intent that you can do is you can consider the credibility of that person because there's really no other evidence that the defense has presented, other than this person, the defendant who has the most to lose, and if you don't think that she's credible, that means you can consider that as evidence of guilt.

---

[8] The jury acquitted Boulerice of the conspiracy count.

-20-

Later, the prosecutor continued:

> We will never know what the true relationship between her and this defendant was. We do know that they haven't put a shred of evidence on from anyone else as to the true nature of the relationship.

Boulerice interposed an objection after this comment. She did not indicate a basis for her objection. The court responded: "I'm going to overrule it. The jury may consider the evidence for what it's worth." The prosecutor then immediately picked up where he left off:

> Calling not just the defendant but another witness as well,[9] and yet you're supposed to believe the uncorroborated testimony of this one person alone.

Boulerice claims that these statements impermissibly shifted the burden of proof in the jury's eyes from the government to her.

Boulerice cites no authority in support of her position, nor can we find any. Indeed, the case law makes clear that when a defendant puts her credibility at issue by testifying, the prosecution can comment on the implausibility of her testimony or its lack of an evidentiary foundation. See, e.g., United States v. Roberts, 119 F.3d 1006, 1014 (1st Cir. 1997) ("When a defendant advances a theory of the case, [] this opens the door to an appropriate response by the prosecution, commenting on the quality

---

[9] Other than Boulerice, the defense called only one other witness at trial — a character witness who did not corroborate Boulerice's story regarding her relationship with her father.

-21-

of his witnesses or attacking the weak evidentiary foundation on which the defendant's theory of the case rested.") (ellipses and quotation marks omitted); United States v. Kubitsky, 469 F.2d 1253, 1255 (1st Cir. 1972) (noting that prosecutor may "comment upon the absence of witnesses other than the defendant, such as alibi witnesses, that might have been logically expected").

As for the particular comments at issue here, we were faced with a similar situation in United States v. Savarese, 649 F.2d 83 (1st Cir. 1981). In that case, the defendant did not choose to take the stand. He did, however, offer alibi testimony from his mother. During closing argument, the government highlighted the fact that the only alibi presented was from a highly biased witness, and that there were no other witnesses to corroborate this alibi. We held that the prosecutor's argument was not improper.

> To be sure, the statements were, to some degree, a comment on defendant's failure to produce evidence, which, of course, defendant had no obligation to do. However, defendant chose to call witnesses and put forth an alibi. Having done so, he had no right to expect the government to refrain from commenting on the quality of his alibi witnesses or from attacking the weak evidentiary foundation on which the alibi rested.

Id. at 87. While it is axiomatic that the prosecutor cannot comment on a defendant's failure to testify, see Griffin v. California, 380 U.S. 609, 615 (1965), once a defendant has taken

the stand in her own defense, the prosecutor is not precluded from impugning the defendant's credibility by commenting on her failure to produce any corroborating evidence.  Other courts have come to the same conclusion.  <u>See</u> <u>United States</u> v. <u>Cabrera</u>, 201 F.3d 1243, 1250 (9th Cir. 2000); <u>United States</u> v. <u>Bautista</u>, 23 F.3d 726, 733 (2d Cir. 1994); <u>United States</u> v. <u>Dahdah</u>, 864 F.2d 55, 59 (7th Cir. 1988); <u>see</u> <u>also</u> 75A Am. Jur. 2d Trial § 605 (2002) ("[A] prosecutor may properly comment on the defendant's failure to present exculpatory evidence which would substantiate defendant's story as long as it does not constitute a comment on a defendant's silence.").  In light of these ample precedents, there was nothing improper about the prosecutor's comments here.[10]

**<u>Affirmed</u>**.

---

[10] Since we have concluded that the statements were not improper, we need not determine whether any objection to them was properly preserved.