UNITED STATES of America,
Appellee,

v.

Lawrence LaSPINA, Defendant,

Robert St. Germain, Defendant–
Appellant.

Docket No. 01–1219.

United States Court of Appeals,
Second Circuit.

Argued: March 25, 2002.

Decided: July 30, 2002.

John M. Thompson, Springfield, MA (Peter L. Maroulis, Poughkeepsie, NY, of counsel), for Defendant–Appellant.

Diane Gujarati, Assistant United States Attorney for the Southern District of New York, New York, N.Y. (Mary Jo White, United States Attorney, Barbara Guss and Celeste L. Koeleveld, Assistant United States Attorneys, of counsel), for Appellee.

Before OAKES and SACK, Circuit Judges, and BRIGHT,* Circuit Judge.

OAKES, Senior Circuit Judge.

On December 13, 2000, after a two-week bench trial, Robert St. Germain was convicted in the United States District Court for the Southern District of New York, Colleen McMahon, *Judge*, of conspiring to engage in monetary transactions in criminally derived property in violation of 18 U.S.C. § 1957(a) and filing false federal income tax returns for the calendar years 1992 and 1993 in violation of 26 U.S.C. § 7206($l$). St. Germain now appeals on several grounds: (1) that the conspiracy count was insufficient to give the district court subject matter jurisdiction; (2) that the conspiracy count was time-barred; (3)

* The Honorable Myron H. Bright, Senior Circuit Judge, United States Court of Appeals for the Eighth Circuit, sitting by designation.

that the tax counts are time-barred; (4) that the evidence against him was constitutionally insufficient to support the conspiracy conviction; (5) that the evidence at trial constructively amended the conspiracy count and created prejudicial variances between the facts alleged and those proved; and (6) that the government presented false and misleading evidence and arguments in violation of his right to due process.

We affirm the judgment of conviction. We write primarily to address St. Germain's second argument: that the conspiracy charge was barred by the statute of limitations.

## BACKGROUND

The conspiracy charge in this case arose from a scheme to launder money made in kickbacks from business that St. Germain steered to Cerplex, Inc. ("Cerplex").[1] From mid–1990 until July 1993, St. Germain managed the Reutilization Department for International Business Machines Corporation ("IBM") in Poughkeepsie, New York. The Reutilization Department was responsible for the sale, recycling, dismantling, and repair of surplus computers and computer parts. During the time St. Germain managed the Reutilization Department, IBM relied on external plants of manufacture ("EPOM") to store, repair, and refurbish old surplus products economically. As manager of the Reutilization Department, St. Germain influenced the award of EPOM contracts.

In September 1990, IBM entered into an EPOM contract with the Jennifer–Ashley Company, Inc. ("JACO"), a company formed in the summer of 1990. The founder of JACO, Linda Schultz, was a former IBM employee whom St. Germain first met in 1985 when Schultz was working as a secretary for IBM in Tucson, Arizona. Schultz testified that, although she was married, their relationship became intimate in early 1991.

JACO secured a permanent EPOM contract with the IBM Reutilization Department to sell surplus computer equipment. The contract provided that proceeds of the sales would be split between JACO and IBM. JACO did not have to submit a competitive bid for the contract, and IBM was JACO's only supplier.

In early 1991, St. Germain asked Schultz to introduce him to her brother, Darrell Elkins, an attorney in Arizona. A few months later, St. Germain, Schultz, and Elkins met in Tucson, Arizona. During the meeting, St. Germain proposed the Cerplex kickback scheme. He suggested that Schultz secure a position as a sales representative at Cerplex, a company that IBM had previously contracted with for the repair of an eight-inch disk drive product. As a Cerplex sales representative, Schultz would collect commissions that resulted from her sales of Cerplex proposals to IBM. St. Germain would sign the future Cerplex contracts at IBM, ensuring that Schultz's proposals would result in contracts and thus in commissions. Elkins would provide legal services to Cerplex on the IBM contracts. Any commissions that Schultz collected from the Cerplex contracts with IBM would then be split between Schultz, Elkins, and St. Germain. Any money that Elkins received from Cer-

---

1. The superseding indictment charged St. Germain with, *inter alia,* conspiracy in violation of 18 U.S.C. § 371 and 18 U.S.C. § 1956(h) based on his involvement in the Cerplex kickback scheme as well as in a bribery scheme involving Recycler's Consulting Group, Inc. ("RCG"). The district court found St. Germain guilty based only on his conduct in the Cerplex kickback scheme. We therefore limit our discussion of the facts to those relevant to the Cerplex scheme.

plex for his legal work would be split between Elkins and St. Germain.

In late 1991, St. Germain instructed Schultz to contact Richard Davis, the chief executive officer at Cerplex, and William Klein, an investor in Cerplex who had previously worked for IBM. Schultz met with Davis and, with no resumé or sales pitch, was offered a position as a Cerplex sales representative. Schultz testified that she had the impression the job was handed to her.

Once Schultz was working at Cerplex, the amount of IBM business awarded to Cerplex from the Reutilization Department increased significantly and included risky and costly arrangements for IBM. David Akers, a contract administrator in the Reutilization Department at the time, testified that St. Germain had a significant amount of control over the Cerplex contracts, and that the contracts were awarded even when Akers and the IBM legal department objected to them.

Evidence at trial indicated that, in addition to steering IBM business to Cerplex, St. Germain helped ensure that Cerplex paid the kickbacks in the form of commissions to Schultz and Elkins on time. In late February 1992, St. Germain sent an electronic message to Davis at Cerplex asking, "Rick, where's the bacon?" On March 3, 1992, Davis responded in an electronic message saying, "The bacon's at the store but the money is in your bank account[.] Have a good day[.]" On the date Davis sent his response, the money was in Elkins's bank account.

Schultz testified that, despite her title of sales representative, she did very little work for Cerplex. Still, between 1992 and 1993, Schultz received over $650,000 in commissions from Cerplex. She transferred a substantial portion of this money to Elkins and deposited some of it into a bank account in the name of Ajack Enterprises, an acronym derived from the first letters of her children's names and the names of St. Germain's children.

During the same time period, Elkins received approximately $1 million from Cerplex. The money was deposited directly into a bank account in the name of Elkins Enterprises, Inc. Half of this amount went to St. Germain, some in cash and some, in order to be inconspicuous, through a real estate investment in Papago Place, a commercial property in Phoenix, Arizona.

Elkins arranged for the $1.1 million purchase of Papago Place in May 1992, with a $450,000 down payment and a $650,000 mortgage from Citibank. Elkins used part of his share and part of St. Germain's share of the Cerplex kickbacks to make the purchase and converted future Cerplex payments into mortgage payments. Although St. Germain's money was used to purchase Papago Place, he was not identified as an owner of the property at the time of purchase.

In July 1992, Schultz began sending Elkins money to purchase an interest in Papago Place. In December 1992, Schultz advised her accountant that the division in ownership of the property would be 45% for Schultz and her husband, 10% for Elkins, and 45% for a "partner of her brother." After St. Germain left IBM in July 1993, Schultz identified St. Germain as her brother's "partner."

On July 6, 1994, Elkins sold his share of Papago Place to St. Germain. St. Germain took legal title to half of Papago Place and Schultz and her husband took legal title to the other half through a limited liability company known as Papago Place L.L.C. The money St. Germain paid for his share of the property was significantly less than its value, indicating that Elkins had previously used part of St. Germain's portion of

the Cerplex money to purchase the property and make mortgage payments, and that Elkins's "share" of the property was in name only.

In the fall of 1998, St. Germain, Schultz, and Schultz's husband sold Papago Place. At the time of the sale, St. Germain and Schultz and her husband held the same interests in the property through Papago Place L.L.C. Approximately $1.7 million in proceeds from the 1998 sale was wired to a Papago Place L.L.C. operating account in New York.

In addition to the Papago Place purchase, St. Germain arranged to receive part of his share of the kickback scheme by purporting to be Schultz's "agent" for the purpose of collecting commissions due to her from Cerplex. Using several shell companies and a sham collection agreement between himself and Schultz, St. Germain collected approximately $2.8 million in commissions due to Schultz and kept approximately $1.6 million of that for himself.

Schultz testified that St. Germain instructed her to lie if she was asked about how St. Germain became a partner in Papago Place. In addition, St. Germain asked Schultz to help him manufacture evidence to support his supposed purchase of Papago Place and to distance himself from record ownership of the property. Finally, St. Germain directed Schultz to create back-dated documents that would make the collection agreement seem legitimate.

During the course of the Cerplex scheme, large amounts of money were deposited into St. Germain's bank accounts that he did not report on his income tax returns. St. Germain did not report as income his share of the Cerplex kickbacks that Elkins paid him as cash or that was invested in Papago Place on St. Germain's behalf. In addition, St. Germain failed to report his share of the down payment and mortgage payments on Papago Place paid with his share of the Cerplex proceeds in 1992 and 1993.

On April 7, 1999, St. Germain was indicted for his involvement in a bribery scheme unrelated to the Cerplex scheme. On July 26, 2000, the government filed a superseding indictment charging St. Germain in four counts. Count One was dismissed on the government's request. Count Two charged St. Germain with conspiracy under 18 U.S.C. § 1956(h) to engage in monetary transactions with criminally derived property in violation of 18 U.S.C. § 1957(a). Specifically, Count Two charged St. Germain with conspiring to launder the proceeds of the bribery scheme described in the initial indictment as well as the proceeds of the Cerplex scheme. Counts Three and Four charged St. Germain with filing false federal income tax returns for the calendar years 1992 and 1993, in violation of 26 U.S.C. § 7206($l$). Finally, pursuant to 18 U.S.C. § 982, the superseding indictment contained a money laundering forfeiture allegation, which pertained to the charges in Count Two.

St. Germain made a motion to dismiss Count Two as time-barred. The district court denied the motion before trial and when it was renewed at the close of the government's evidence.

St. Germain requested, and the government consented to, a bench trial on the superseding indictment. The trial court convicted St. Germain on all counts as they related to the Cerplex scheme. He was sentenced to concurrent terms of imprisonment of 63 months on the conspiracy count, 36 months on the 1992 tax count, and 36 months on the 1993 tax count, to be followed by a term of two years' supervised release. In addition, St. Germain was ordered to pay a $15,000 fine and a

$300 special assessment and, based on a forfeiture allegation pertaining to the conspiracy charge, to forfeit $1,227,000.

Following his conviction, St. Germain moved to set aside the verdict pursuant to Fed.R.Crim.P. 29 or for an arrest of judgment pursuant to Fed.R.Crim.P. 34. St. Germain argued: 1) the district court lacked jurisdiction over Count Two because the Grand Jury was not presented with evidence that St. Germain steered business to Cerplex in exchange for payment; 2) Count Two was insufficient because it failed to set forth the specified unlawful activity that gave rise to the money laundering transactions; 3) the government impermissibly shifted the burden of proof; 4) Counts Three and Four varied impermissibly from the original indictment and were thus time-barred; and 5) the evidence as to all counts was insufficient to support a conviction. The district court denied the motion on all grounds. This appeal followed.

## DISCUSSION

We discuss separately each of St. Germain's claims of error, turning first to the claim that the conspiracy charge was barred by the statute of limitations.

### I. Statute of Limitations Over Conspiracy Count

■ Count Two charged St. Germain with conspiring to engage in monetary transactions of criminally derived property in violation of 18 U.S.C. § 1956(h)(2001). The statute of limitations for actions brought under § 1956(h) is five years. 18 U.S.C. § 3282 (2000).

■ In order for the conspiracy charge alleged in Count Two to fall within the statute of limitations, (1) the "conspiracy must still have been ongoing within the five year period preceding the indictment, and (2) 'at least one overt act in furtherance of the conspiratorial agreement [must have been] performed within that period.'" *United States v. Ben Zvi,* 242 F.3d 89, 97 (2d Cir.2001) (quoting *Grunewald v. United States,* 353 U.S. 391, 396–97, 77 S.Ct. 963, 1 L.Ed.2d 931 (1957)) (alteration in original).[2] In this case, the superseding indictment was returned on July 26, 2000. Therefore, for the conspiracy charge in Count Two to have fallen within the statute of limitations, the conspiracy must have continued until at least July 26, 1995.

■ "[T]he crucial question in determining whether the statute of limitations has run is the scope of the conspiratorial agreement, for it is that which determines both the duration of the conspiracy, and whether the act relied on as an overt act may properly be regarded as in furtherance of the conspiracy." *Grunewald,* 353 U.S. at 397, 77 S.Ct. 963. St. Germain

**2.** Two circuits have recently held that a § 1956(h) conspiracy does not require proof of an overt act. *United States v. Tam,* 240 F.3d 797, 802 (9th Cir.2001) (reasoning that "[t]he language of 18 U.S.C. § 1956(h) is nearly identical to the language of 21 U.S.C. § 846 [(criminalizing conspiracy to commit drug offenses)], which the Supreme Court held in *United States v. Shabani,* 513 U.S. 10, 15, 115 S.Ct. 382, 130 L.Ed.2d 225 (1994), does not require proof of an overt act"); *accord United States v. Godwin,* 272 F.3d 659, 669 n. 9 (4th Cir.2001), *cert. denied,* —— U.S. ——, 122 S.Ct. 1942, 152 L.Ed.2d 846 (2002).

We have not specified the essential elements of § 1956(h), as distinct from those of the general federal conspiracy statute, 18 U.S.C. § 371, *see United States v. Vargas,* 986 F.2d 35, 39–40 (2d Cir.1993) (discussing the defendant's liability for conspiracy to launder the proceeds of drug trafficking, where the government charged that conspiracy under 18 U.S.C. § 371 rather than § 1956(h)) and have therefore not considered whether proof of an overt act is a necessary element of § 1956(h). Because there is sufficient proof of an overt act in this case, we need not and do not decide this question.

argues that the scope of the conspiracy was limited to putting St. Germain's share of the Cerplex proceeds into his control. Therefore, according to St. Germain, the conspiracy was complete and the last possible overt act committed on July 6, 1994, when Elkins sold his last share of Papago Place to Papago Place L.L.C., a company controlled by St. Germain.

The government argues that the conspiracy continued into 1998 when St. Germain sold Papago Place. According to the government, the scope of the conspiracy included any monetary transactions made by the conspirators with the Cerplex money. Thus, the government argues that two acts alleged in the indictment—St. Germain's withdrawal of approximately $118,000 from a certificate of deposit in March 1996 and the sale of Papago Place in 1998—as well as several additional acts proven at trial bring Count Two within the statute of limitations.

We reject St. Germain's characterization of the scope of the conspiracy because it is unduly narrow, but we do not fully embrace the government's position. The government's reading of the scope of the conspiracy to include any monetary transactions made by the conspirators with the Cerplex money is overbroad. We do agree with the government's conclusion that the 1996 and 1998 transactions fell within the scope of the conspiracy because the conspirators did not receive their anticipated economic benefits from the conspiracy until the 1998 sale of Papago Place. The conspiracy continued at least until then, well within the limitations period.

 "A conspiracy involves an agreement by at least two parties to achieve a particular illegal end." *United States v. Stavroulakis*, 952 F.2d 686, 690 (2d Cir. 1992). In order for a defendant to be convicted of conspiracy, "there must be

proof beyond a reasonable doubt that [the conspirators] agreed on the 'essential nature of the plan.' " *Id.* (quoting *Blumenthal v. United States*, 332 U.S. 539, 557, 68 S.Ct. 248, 92 L.Ed. 154 (1947)). We therefore "focus on the essence of the underlying illegal objective to determine" the scope of the conspiracy. *Id.*

 St. Germain was convicted under 18 U.S.C. § 1956(h) of conspiring to engage in monetary transactions in violation of 18 U.S.C. § 1957(a). Section 1957 makes it a crime to "knowingly engage[ ] or attempt[ ] to engage in a monetary transaction in criminally derived property of a value greater than $10,000 [that] is derived from specified unlawful activity." 18 U.S.C. § 1957(a) (2001). The illegal objective of a conspiracy to engage in monetary transactions in violation of § 1957(a) is the monetary transaction involving unlawfully obtained property, not the underlying act of unlawfully obtaining it. *See Stavroulakis* 952 F.2d at 691; *United States v. Holmes*, 44 F.3d 1150, 1154 (2d Cir.1995). Therefore, because the monetary transaction is the illegal objective, a conspiracy to engage in such transactions continues as long as one or more conspirators engages in monetary transactions as contemplated by the conspiratorial agreement.

St. Germain argues persuasively that construing the conspiracy to continue as long as one conspirator engages in any monetary transactions involving the criminally derived property, irrespective of whether the transactions are intended to further the initial aims of the conspiracy, results in an indeterminate extension of the statute of limitations. The Supreme Court has warned that it "view[s] with disfavor attempts to broaden the already pervasive and wide-sweeping nets of conspiracy prosecutions." *Grunewald*, 353 U.S. at 404, 77 S.Ct. 963. The Court has

further instructed that in determining "whether the statute of limitations has run," we should analyze "the scope of the conspiratorial agreement, for it is that which determines both the duration of the conspiracy, and whether the act relied on as an overt act may properly be regarded as in furtherance of the conspiracy." *Id.* at 397, 77 S.Ct. 963. Accordingly, the conspirators' purpose or intent informs the scope of the conspiracy. Otherwise, a conspiracy knowingly to engage in monetary transactions in criminally derived property, 18 U.S.C. § 1957(a), would be "an indefinitely continuing offense" with an "indeterminate" statute of limitations, *Krulewitch v. United States* 336 U.S. 440, 456, 69 S.Ct. 716, 93 L.Ed. 790 (1949) (Jackson, *J.*, concurring).

The government argues that our holding in *United States v. Monaco*, 194 F.3d 381 (2d Cir.1999), supports the proposition that the scope of a conspiracy includes any transaction involving the criminally derived property. We disagree. In *Monaco*, we noted that a conspiracy to launder proceeds from drug trafficking and piracy was within the statute of limitations even though the monetary transactions in furtherance of the laundering conspiracy were made as many as twelve years after the drug trafficking and piracy ended. *Id.,* 194 F.3d at 387 n. 2. The *Monaco* defendants continued until then to commit acts in furtherance of their conspiracy "to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity," *id.* at 386 (quoting 18 U.S.C. § 1956(a)(1)(B)(I)), viz., drug trafficking and piracy. Contrary to the government's reading of *Monaco*, the monetary transactions were not deemed to be within the scope of the conspiracy simply because they involved the drug trafficking and piracy proceeds. The transactions were deemed part of the conspiracy because

they furthered the original aims of the conspiracy, to "conceal" and "disguise" the "nature, source, the ownership or control" of the proceeds. *Monaco,* therefore, like *Krulewitch* and *Grunewald,* analyzed the aims of the conspiracy to determine whether a specific act fell within its scope.

■ But we disagree with St. Germain's alternative and unduly narrow characterization of the scope of the conspiracy as limited to putting St. Germain's share of the Cerplex proceeds into his control. Where the object of a conspiracy is economic, the conspiracy generally "continues until the conspirators receive their anticipated economic benefits." *United States v. Mennuti,* 679 F.2d 1032, 1035 (2d Cir. 1982); *accord id.* at 1035–36 (collecting cases for the same proposition). If the conspirators received their anticipated economic benefits after placing St. Germain's share of the proceeds within his control, then that placement did not end the conspiracy.

We need not speculate about the outer limits of the conspiratorial agreement to conclude that both the 1996 withdrawal from the certificate of deposit and the 1998 sale of Papago Place were within the scope of the conspiracy.

The trial court found proof beyond a reasonable doubt that St. Germain conspired with Schultz and Elkins to engage in a series of monetary transactions with the money derived from the Cerplex scheme. The scheme began with Schultz and Elkins receiving money from business that St. Germain steered to Cerplex. Schultz and Elkins then kicked portions of their commissions back to St. Germain. In an effort to hide the kickback scheme, St. Germain, Schultz, and Elkins used the Cerplex money in several monetary transactions between 1992 and 1998. In 1992, Elkins, acting as a strawman for St.

Germain, used part of St. Germain's proceeds from the Cerplex scheme to purchase Papago Place. In 1993 and 1994, St. Germain used several shell companies to engage in monetary transactions with proceeds from the Cerplex scheme. In 1994, Elkins used Cerplex money to pay off the mortgage on Papago Place and subsequently transferred complete title to St. Germain through Papago Place L.L.C. In March 1996, St. Germain withdrew approximately $118,000 from a certificate of deposit he had established with Cerplex proceeds in 1994. Finally, in August 1998, St. Germain caused Papago Place L.L.C. to sell Papago Place, resulting in a wire transfer of approximately $1.7 million into the account of Papago Place L.L.C. Thus, St. Germain and Schultz did not "receive their anticipated economic benefits" as contemplated by the conspiratorial agreement until the sale of Papago Place. The conspiracy was therefore ongoing until at least 1998 when Papago Place was sold.

■■■ St. Germain argues that the withdrawal from the certificate of deposit and the wire transfer from the sale of Papago Place were not transactions contemplated by the conspiratorial agreement because he acted alone in making these transactions. However, while conspirators must agree on the " 'essential nature' " of the conspiracy, they "need not agree on every detail of their venture." *Stavroulakis*, 952 F.2d at 690 (noting that "[t]he policies underlying conspiratorial liability could easily be thwarted by the careful compartmentalization of information, and 'conspirators would go free by their very ingenuity,' if it were required that they agree on all details of the scheme" (quoting *Blumenthal*, 332 U.S. at 557, 68 S.Ct. 248)). The conspirators had agreed to launder the proceeds of the scheme. They did not have to agree further on the details of each

transaction in furtherance of that objective.

Moreover, the 1996 and 1998 transactions were part of a series of transactions made throughout the life of the conspiracy and thus part of a single ongoing agreement. First, the money withdrawn in 1996 was Cerplex commission money that St. Germain placed in a certificate of deposit in 1994 under the name of a shell company created to carry out the sham commission agreement with Schultz. Second, Papago Place had originally been bought to disguise St. Germain's involvement in the Cerplex scheme. Several monetary transactions resulted from the purchase, ending with the sale of the property in 1998. At the time Papago Place was sold, St. Germain and Schultz were still co-owners of the property, thus demonstrating the conspirators' continued involvement with the Cerplex money and with each other. Therefore, the 1996 and 1998 transactions were contemplated by the conspiratorial agreement and demonstrate that the conspiracy was ongoing as late as 1998.

■■■ In addition to establishing the continued existence of the conspiracy, the 1996 and 1998 transactions qualify as overt acts in furtherance of the conspiracy, assuming such overt acts are required. *See* footnote 2, *supra*. "To constitute an overt act for purposes of the statute of limitations the act must involve some affirmative conduct or deliberate omission on the part of [a conspirator]." *Ben Zvi*, 242 F.3d at 97. An "overt act[ ] . . . [is] meaningful only if [it is] within the scope of the conspiratorial agreement," *Grunewald*, 353 U.S. at 414, 77 S.Ct. 963, but an overt act may be made by "only a single one of the conspirators and need not be itself a crime." *Braverman v. United States*, 317 U.S. 49, 53, 63 S.Ct. 99, 87 L.Ed. 23 (1942).

As discussed above, the withdrawal of Cerplex money in 1996 and the wire trans-

fer from the sale of Papago Place in 1998 fell within the scope of the conspiracy. The transactions were part of a single continuing agreement and were made by St. Germain, a conspirator who had not withdrawn from the conspiracy. Therefore, the transactions were overt acts in furtherance of the conspiracy.[3]

In summary, the conspiracy in this case continued at least until the conspirators received their anticipated economic benefits from the Cerplex scheme. Because the conspirators did not receive their anticipated economic benefits until the sale of Papago Place in 1998 and the government proved that the conspiracy continued at least until that date, Count Two was not barred by the statute of limitations.

## II. Sufficiency of the Indictment

■ St. Germain argues that Count Two failed to allege the object of the conspiracy charged and the specified unlawful activity with respect to Cerplex. As a result, St. Germain argues, the district court lacked subject matter jurisdiction over Count Two.

■ "A criminal defendant is entitled to an indictment that states the essential elements of the charge against him." *United States v. Pirro,* 212 F.3d 86, 91 (2d Cir.2000) (citing *Jones v. United States,* 526 U.S. 227, 232, 119 S.Ct. 1215, 143 L.Ed.2d 311 (1999); *Hamling v. United States,* 418 U.S. 87, 117, 94 S.Ct. 2887, 41 L.Ed.2d 590 (1974)). Accordingly, Fed. R.Crim.P. 7 provides that "[t]he indictment ... shall be a plain, concise and definite written statement of the essential facts constituting the offense charged." Fed.R.Crim.P. 7(c)(1).

■ To satisfy the pleading requirements of Fed.R.Crim.P. 7(c)(1), " 'an indictment need do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime.' " *Stavroulakis,* 952 F.2d at 693 (quoting *United States v. Tramunti,* 513 F.2d 1087, 1113 (2d Cir.1975)). An indictment " 'must be read to include facts which are necessarily implied by the specific allegations made.' " *Id.* (quoting *United States v. Silverman,* 430 F.2d 106, 111 (2d Cir.1970)). In short, "an indictment is sufficient if it, first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense." *Hamling,* 418 U.S. at 117, 94 S.Ct. 2887.

■ Because St. Germain first raised the issue in a post-trial motion, we read the superseding indictment liberally. *United States v. Sabbeth,* 262 F.3d 207, 218 (2d Cir.2001); *United States v. Wydermyer,* 51 F.3d 319, 324 (2d Cir.1995). Further, "in an indictment for conspiring to commit an offense—in which the conspiracy is the gist of the crime—it is not necessary to allege with technical precision all the elements essential to the commission of the offense which is the object of the conspiracy." *Wydermyer,* 51 F.3d at 325 (quoting *Wong Tai v. United States,* 273 U.S. 77, 81, 47 S.Ct. 300, 71 L.Ed. 545 (1927)). Thus, to prevail on his claim that the conspiracy count was insufficient, St. Germain "must show that the indictment, liberally construed, was not 'sufficient to identify the offense which [he] conspired to

---

**3.** We note that the government proved additional acts at trial that would likely qualify as overt acts in furtherance of the conspiracy. Because we find the 1996 and 1998 transactions constitute overt acts in furtherance of the conspiracy, we do not specifically address these additional acts.

commit.' " *Id.* at 326 (quoting *Wong Tai,* 273 U.S. at 81, 47 S.Ct. 300).

Under this standard, Count Two easily satisfies the pleading requirement. It put St. Germain on notice that he was being charged with conspiracy under 18 U.S.C. § 1956(h) to engage in monetary transactions with criminally derived property in violation of 18 U.S.C. § 1957(a). Paragraph 13 of the superseding indictment tracked the statutory language of § 1957(a) by identifying the object of the conspiracy as "engag[ing] and attempt[ing] to engage in monetary transactions in criminally derived property that was of a value greater than $10,000 and that was derived from specified unlawful activity[.]" The same paragraph identified the "specified unlawful activity" from which the property was derived as "interstate transportation of property obtained by fraud and wire fraud."

Count Two went on to specifically allege facts with respect to the Cerplex scheme. Paragraph 14(b) alleged that: (1) St. Germain, an IBM employee, steered IBM business to Cerplex; (2) Schultz, acting as a Cerplex sales representative, received commissions for the IBM business; and (3) Schultz kicked a portion of the commissions back to St. Germain. Count Two thus adequately put St. Germain on notice that he was charged with a conspiracy to commit the underlying substantive offense of money laundering based on the Cerplex scheme.[4]

III. Statute of Limitations for Counts Three and Four

■ St. Germain argues that the tax counts alleged in Counts Three and Four are time-barred. Although the tax counts in the original indictment fell within the applicable statute of limitations, St. Germain argues that the tax counts in the superseding indictment are substantially broader than those in the original indictment and therefore do not relate back to the original indictment.

■ "Once an indictment is brought, the statute of limitations is tolled as to the charges contained in that indictment." *United States v. Grady,* 544 F.2d 598, 601 (2d Cir.1976).

> When a superseding indictment supplants a pending timely-filed indictment, any charges in the superseding indictment that are neither materially broadened nor substantially amended from the earlier indictment relate back to the date of the filing of the earlier indictment. The superseding indictment continues its predecessor's tolling of the statute of limitations and inherits its predecessor's timeliness.

*Ben Zvi,* 242 F.3d at 98 (citing *United States v. O'Bryant,* 998 F.2d 21, 23 (1st Cir.1993); *Grady,* 544 F.2d at 601).

The original indictment in this case was filed on April 7, 1999. Counts Four and Five of the original indictment charged St. Germain with subscribing to materially false income tax returns for the calendar years 1992 and 1993. The statute of limitations for tax offenses under Title 26 is six years. 26 U.S.C. § 6531 (2001). St. Germain filed his 1992 tax returns on April 15, 1993, and his 1993 tax return on April 14, 1994. Therefore, the statute of limitations for the 1992 false tax return count ran on April 15, 1999, and the statute of limitations for the 1993 false tax return

---

4. Although we need not address it in this case, we note that the Supreme Court recently rejected St. Germain's argument that indictment omissions are jurisdictional defects, holding that, because "defects in an indictment do not deprive a court of its power to adjudicate a case," such defects are not jurisdictional errors. *United States v. Cotton,* 535 U.S. ——, 122 S.Ct. 1781, 1784–85, 152 L.Ed.2d 860 (2002).

count ran on April 15, 2000. *See United States v. Silverman,* 449 F.2d 1341, 1346 (2d Cir.1971). Both counts of the original indictment thus fell within the statute of limitations.

The superseding indictment was returned on July 26, 2000. Counts Four and Five of the original indictment were renumbered as Counts Three and Four but were otherwise identical to the original counts. Despite this, St. Germain argues that Counts Three and Four of the superseding indictment impermissibly broadened the tax counts beyond the allegations in the original indictment because Count Two of the superseding indictment added allegations that he had received income in 1992 and 1993 from the Cerplex kickback scheme. Because the original indictment did not make any allegations regarding the Cerplex scheme, St. Germain argues that the superseding indictment impermissibly broadened the basis for the tax evasion charges.

■ The central policy underlying statutes of limitation is timely notice to the defendant "that [he] will be called to account for [his] activities and should prepare a defense." *Grady,* 544 F.2d at 601; *see also United States v. Gengo,* 808 F.2d 1, 3 (2d Cir.1986) ("notice to defendants is at the core of the limitations doctrine"). "Similarly, notice is the touchstone in deciding whether a superseding indictment substantially changes the original charges." *Gengo,* 808 F.2d at 3.

■ The original indictment in this case informed St. Germain that he was being charged with subscribing to materially false income tax returns for tax years 1992 and 1993, in violation of 26 U.S.C. § 7206(1). Using identical language, the superseding indictment charged St. Germain with the same offense for the same years. St. Germain argues that, despite the identical language, the superseding in-

dictment substantially changed the original charges because it alleged a new source of unreported income, namely, the proceeds from the Cerplex scheme. However, the source of unreported income is not an essential element of an offense under 26 U.S.C. § 7206(1). *United States v. Rodriguez,* 545 F.2d 829, 831–32 (2d Cir.1976). The elements of an offense under 26 U.S.C. § 7206(1) are: "(1) that the defendant made or caused to be made, a federal income tax return for the year in question which he verified to be true; (2) that the tax return was false as to a material matter; (3) that the defendant signed the return willfully and knowing it was false; and (4) that the return contained a written declaration that it was made under the penalty of perjury." *Pirro,* 212 F.3d at 89. Therefore, the source of unreported income is "not essential to the proof of the violation charged." *Rodriguez,* 545 F.2d at 832.

Neither the original nor the superseding indictment alleged the source or the amount of income that St. Germain failed to declare. In addition, such information was neither requested nor provided in a bill of particulars. Any change in the proof regarding the source or amount therefore did not alter the charges made in the original indictment, and the government was permitted to present its proof of the crime charged, regardless of when such proof was uncovered.

Because the charging language and the elements of the offense in this case remained unchanged in the superseding indictment, the charges in Counts Three and Four were not impermissibly broadened by the superseding indictment, and St. Germain had adequate notice of the offense with which he was being charged. The tax counts in the superseding indictment therefore relate back to the original

indictment and are not barred by the statute of limitations.

## IV. Sufficiency of Evidence

 St. Germain challenges the sufficiency of the evidence for each count for which he was convicted. "A defendant challenging a conviction based on a claim of insufficiency of the evidence bears a heavy burden." *United States v. Dhinsa,* 243 F.3d 635, 648 (2d Cir.) (citing *United States v. Walsh,* 194 F.3d 37, 51 (2d Cir. 1999)), *cert. denied,* —— U.S. ——, 122 S.Ct. 219, 151 L.Ed.2d 156 (2001). Trial evidence is viewed "in its totality" and is considered "in the light most favorable to the government, crediting every inference that the [fact finder] might have drawn in favor of the government." *Id.* (internal citations omitted). If the evidence "suffices to convince any rational trier of fact of the defendant's guilt beyond a reasonable doubt, then [the] conviction must stand." *United States v. Martinez,* 54 F.3d 1040, 1042 (2d Cir.1995); *see Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) (jury's verdict must be sustained if "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt") (emphasis in original).

 In our analysis, "[w]e defer to the [fact finder]'s determination of the weight of the evidence and the credibility of the witnesses, and to the [fact finder]'s choice of the competing inferences that can be drawn from the evidence." *United States v. Morrison,* 153 F.3d 34, 49 (2d Cir.1998). In addition, "[p]roof of the elements of the crimes charged may be entirely by circumstantial evidence." *Id.* (citing *United States v. Sureff,* 15 F.3d 225, 228 (2d Cir.1994)).

 Viewed in the light most favorable to the government, the evidence presented at trial fully supported the district court's finding of guilt on Counts Two, Three, and Four of the superseding indictment. With regard to Count Two, conspiracy to engage in monetary transactions with criminally derived property, St. Germain argues that there is no proof that he either agreed to steer business to Cerplex, that he in fact succeeded in steering business to Cerplex, or that there was a connection between the contracts IBM awarded to Cerplex and the commissions paid to Schultz. However, the testimony of Akers, a former IBM contract administrator, and Schultz established that: (1) St. Germain had significant influence over the award of IBM contracts to EPOM like Cerplex; (2) St. Germain arranged for Schultz to be a "sales representative" at Cerplex; and (3) Cerplex received significant business from IBM in 1992 and 1993 when the kickback scheme was in place. From this evidence, a rational fact finder could conclude that St. Germain agreed to and did steer business to Cerplex in furtherance of the kickback scheme.

In addition, a rational fact finder could infer a connection between the IBM contracts and Schultz's commissions based on timing in the case. Schultz testified that after St. Germain set up the kickback scheme and arranged for Schultz to work at Cerplex, Cerplex entered into several contracts with IBM that generated substantial income for Cerplex but often put IBM at unnecessary risk. Moreover, Schultz received commissions as a sales representative for the IBM business despite the fact that IBM had never worked with a sales representative in its previous dealings with Cerplex. The email exchange between St. Germain and Davis, Cerplex's CEO, in February 1992 further supports a connection between the IBM contracts and Schultz's commissions. In response to St. Germain's message asking "where's the bacon," Davis replied, "the

bacon's at the store, but the money is in your bank account." While St. Germain argues that there is an alternative explanation for the email exchange, the district court could have reasonably concluded that the email refers to commission payments due to Schultz for business St. Germain steered to Cerplex.

The trial court summarized its findings with regard to Count Two as follows:

> There is no question that the evidence adduced at trial—from Linda Schultz and from numerous other witnesses and records—supported the Government's contention that St. Germain used Schultz (his paramour) and her brother to receive money from Cerplex; that the payment of those monies could not be attributed to any work actually done by Linda Schultz or her brother; that St. Germain received a "cut" of these so-called "sales commissions" and that he invested a significant portion of those proceeds in the building known as Papago Place. The trial evidence supported the charge made in the indictment.

(March 13, 2001, Order at 3). All of the court's findings were supported by the evidence, which was sufficient to establish a connection between St. Germain's actions and Schultz's commissions.

■ With regard to Counts Three and Four, the tax counts, St. Germain argues that the evidence was insufficient to establish that he received income from the Cerplex scheme and, therefore, that he willfully failed to report the income. Schultz's testimony and documentary evidence of various transactions established that St. Germain received one-third of the Cerplex commissions paid to Schultz and Elkins in 1992 and 1993, that Elkins funneled most of that income into Papago Place, and that St. Germain was involved in the ownership of Papago Place as early as 1992. The district court could have rationally con-

cluded that St. Germain received income from the Cerplex scheme and, regardless of what he did with the income at the time, failed to report it for income tax purposes. The evidence was thus sufficient to support the district court's finding of guilt on the tax counts.

V. Constructive Amendment and Prejudicial Variance

■ St. Germain argues that the government's trial presentation constructively amended the conspiracy charge in Count Two of the superseding indictment and prejudicially varied from the facts alleged in the indictment. We disagree.

■ A constructive amendment of an indictment " 'occurs when the charging terms of the indictment are altered, either literally or in effect, by prosecutor or court after the grand jury has last passed upon them.' " *United States v. Zingaro*, 858 F.2d 94, 98 (2d Cir.1988) (quoting *Gaither v. United States*, 413 F.2d 1061, 1071 (D.C.Cir.1969)). As such, a constructive amendment is a *per se* violation of the Fifth Amendment. *United States v. Delano*, 55 F.3d 720, 729 (2d Cir.1995). "To prevail on a constructive amendment claim, a defendant must demonstrate that either the proof at trial or the trial court's jury instructions so altered an essential element of the charge that, upon review, it is uncertain whether the defendant was convicted of conduct that was the subject of the grand jury's indictment." *United States v. Frank*, 156 F.3d 332, 337 (2d Cir.1998) (*per curiam*) (citing *Zingaro*, 858 F.2d at 98). "In determining whether an 'essential element' of the offense has been modified, moreover, we have 'consistently permitted significant flexibility in proof, provided that the defendant was given notice of the core of criminality to be proven at trial.' " *Delano*, 55 F.3d at 729 (quoting *United States v. Patino*, 962 F.2d

263, 266 (2d Cir.1992) (internal quotations omitted)).

■ Moreover, in the context of a conspiracy charge, "[t]he Government need not ... set out with precision each and every act committed ... in furtherance of the conspiracy," particularly where the acts proven at trial were part of the "core of the overall scheme and in furtherance of that scheme." *United States v. Cohen*, 518 F.2d 727, 733 (2d Cir.1975). "It is clear the Government may offer proof of acts not included within the indictment, as long as they are within the scope of the conspiracy." *United States v. Bagaric*, 706 F.2d 42, 64 (2d Cir.1983), *abrogated on other grounds by Nat'l Org. for Women, Inc. v. Scheidler*, 510 U.S. 249, 259–60, 114 S.Ct. 798, 127 L.Ed.2d 99 (1994).

St. Germain argues that the superseding indictment was constructively amended because the government's proof expanded the conspiracy to include proceeds from the collection agreement and expanded Elkins's role in the conspiracy. However, both the collection agreement and Elkins's role in the conspiracy were well within the scope of the conspiracy alleged in the superseding indictment.

■ The superseding indictment charged St. Germain with conspiracy, "together with others known and unknown ..., [to] unlawfully, wilfully, and knowingly, ... engage and attempt to engage in monetary transactions in criminally derived property ... that was derived from specified unlawful activity, to wit, the interstate transportation of property obtained by fraud and wire fraud, in violation of Title 18, United States Code, Section 1957(a)." The essential elements of a conspiracy to engage in monetary transactions with criminally derived property are that the defendant conspired with one or more persons to: (1) engage or attempt to engage; (2) in a monetary transaction; (3) in criminally derived property that is of a value greater than $10,000; (4) knowing that the property is derived from unlawful activity; and (5) that the property is, in fact, derived from specified unlawful activity.

The superseding indictment specifically alleged that the money used in the transactions at issue was derived from a fraudulent scheme involving commissions that Cerplex paid to Schultz and that St. Germain received a portion of the commissions. The purpose of the collection agreement between Schultz and St. Germain was to provide a vehicle for St. Germain to recover part of his share of the proceeds. The agreement was thus evidence of St. Germain's receipt of the criminally derived property. As such, it fell squarely within the scope of the conspiracy as charged in the indictment and did not alter an essential element of the offense.

In addition, as stated above, the superseding indictment referred to conspirators "known and unknown." It also specifically identified Elkins as one of the co-conspirators. While the indictment referred to Elkins as a strawman in the purchase of Papago Place, such reference did not limit Elkins's involvement to this act because "the Government may offer proof of acts not included within the indictment, as long as they are within the scope of the conspiracy." *Bagaric*, 706 F.2d at 64. The government's evidence of Elkins's involvement in the conspiracy was within the scope of the conspiracy and therefore did not alter an essential element of the crime for which St. Germain was charged. The superseding indictment was not constructively amended by the government's proof.

■ Similarly, the government's proof at trial did not prejudicially vary from the facts alleged in the indictment. "A vari-

ance arises when the evidence adduced at trial establishes facts different from those alleged in an indictment." *Dunn v. United States,* 442 U.S. 100, 105, 99 S.Ct. 2190, 60 L.Ed.2d 743 (1979). Unlike a constructive amendment, a variance "does not broaden the possible basis for conviction beyond that contained in the indictment." *Patino,* 962 F.2d at 266. Accordingly, a defendant must show that the variance resulted in "substantial prejudice" in order to obtain relief from his conviction. *United States v. McDermott,* 918 F.2d 319, 326 (2d Cir.1990).

St. Germain argues that several pieces of evidence at trial varied from the facts in the indictment and thus constituted prejudicial variances. Such evidence includes: (1) Schultz's testimony suggesting that her sales representative contract with Cerplex was a sham; (2) Akers's testimony that Cerplex did not employ third party sales representatives; (3) evidence that Klein and Davis were co-conspirators at Cerplex; and (4) evidence that Schultz paid some of the mortgage on Papago Place. Assuming *arguendo* that any of this evidence varied from the facts alleged, St. Germain has not established that such a variance was prejudicial. The challenged evidence was within the scope of the Cerplex conspiracy as alleged and, as such, was not of a character that could prejudice St. Germain. "A variance is immaterial—and hence not prejudicial—'where the allegation and proof substantially correspond, where the variance is not of a character that could have misled the defendant at the trial, and where the variance is not such as to deprive the accused of his right to be protected against another prosecution for the same offense.'" *United States v. Mucciante,* 21 F.3d 1228, 1236 (2d Cir.1994) (quoting *United States v. Heimann,* 705 F.2d 662, 669 (2d Cir.1983)). Because any possible variance identified

by St. Germain was immaterial, there was no prejudicial variance between the alleged conspiracy and the proof at trial.

## VI. False and Misleading Evidence and Arguments

St. Germain argues that the government presented false and misleading testimony through agent George Franischelli and made false and misleading arguments in summation in violation of St. Germain's right to due process. Having carefully considered this argument, raised by St. Germain for the first time on appeal, we find it to be without merit.

## CONCLUSION

For the foregoing reasons, the judgment of conviction is affirmed.