**UNITED STATES of America,**

v.

**Nat SCHLESINGER, also known as "Naftule Schlesinger" and "Zvi Pollack," Herman Niederman, and Goodmark Industries, Inc., Defendants.**

**Cr. No. 02–485(ADS)(ALL).**

United States District Court, E.D. New York.

March 18, 2005.

Roslynn R. Mauskopf, United States Attorney by Lawrence Philip Ferazani, Assistant U.S. Attorney, Central Islip, NY, for Plaintiff.

Shaw Licitra Gulotta Esernio & Schwartz, P.C. by Douglas T. Burns, Esq., Garden City, NY, Randy Scott Zelin, P.C. by Randy Scott Zelin, Esq., Westbury, NY, for defendants Nat Schlesinger and Goodmark Industries, Inc.

Law Offices of Daniel Ollen by Daniel J. Ollen, Esq., New York City, for defendant Herman Niederman.

## MEMORANDUM OF DECISION AND ORDER

SPATT, District Judge.

This case involves charges of conspiracy to commit insurance fraud and creditor fraud, and arson. On October 1, 2003, a grand jury entered a 34 count Superseding Indictment ("Indictment") against defendants Nat Schlesinger ("Schlesinger"), Herman Niederman ("Niederman"), and Goodmark Industries, Inc. ("Goodmark") (collectively the "Defendants"), arising out of, among other things, a series of fires dating back to 1987 that occurred at a factory in the Williamsburg section of Brooklyn. Presently before the Court are the following motions by the Defendants: (1) a motion to dismiss Count One, Twenty, and Twenty–Two through Thirty–Four of the Indictment; (2) a motion to sever Counts Twenty–Three to Thirty–Four from the remaining Counts; (3) a motion to sever defendant Niederman; (4) a motion to grant a bill of particulars; (5) a motion to suppress evidence; and (6) a motion to transfer the location of the trial.

## BACKGROUND

### I. Summary of Alleged Facts

The following facts are taken from the Indictment and the Government's response to the Defendants' motions. Schlesinger owned and maintained a place of business with his brother, Jack Schlesinger, in a building that was identified at various times as: (1) 48–76 Wallabout Street, Brooklyn, New York; (2) 50 Wallabout Street, Brooklyn, New York; (3) 750 Kent Avenue, Brooklyn, New York; and (4) 1 Classon Avenue, Brooklyn, New York ("the Premises"). Apparently, the various addresses for the same building are due to the fact that the Premises occupied an entire city block and had multiple entrances.

The Premises was designed and equipped as a clothing manufacturing factory. Schlesinger and his brother operated numerous clothing manufacturing companies in this location from the time they purchased the building in the early 1980's. These companies included Pous Apparel, Inc. ("Pous Apparel"), Private Brands of Delaware, Inc. ("Private Brands") and the defendant Goodmark. The indictment alleges that the brothers jointly exercised total control over each company but masked their ownership of the various companies to conceal their fraudulent schemes. One scheme involved defrauding insurance companies by submitting fraudulent claims for losses resulting from a series of fires that occurred at the Premises from 1987 to 1999. The second scheme involved using Private Brands and Goodmark as a vehicle to defraud various creditors. The Court will discuss each scheme separately.

### A. The Alleged Insurance Fraud Scheme

On August 7, 1987 a fire occurred at the Premises, which at the time was doing business under the name Pous Apparel. At the time of the fire Schlesinger was

listed as the vice-president of the company. The indictment alleges that Schlesinger, along with his brother, controlled the company. Schlesinger hired Jack DuBoff and Associates ("DuBoff"), a public adjusting firm located in Valley Stream, New York, to negotiate Pous Apparel's claim for loss resulting from the fire. The indictment alleges that Schlesinger agreed to pay Duboff a cash bribe in exchange for an inflated and false claim to Pous Apparel's insurance company. Upon receipt of the fraudulent proof of loss, the insurance company paid the claim in the amount of $1,065,000. The money was deposited in the account of Pous Apparel. Schlesinger paid Duboff the cash bribe, and Duboff distributed the cash to the other co-conspirators.

In June of 1990 and September 1991, a second and third fire occurred at the Premises, which at the time was doing business as Private Brands. At various times, Schlesinger listed himself as director, executive vice-president, vice-president, and owner of Private Brands. The indictment further alleges that Schlesinger owned and controlled the day-to-day operations of the company. As with the first fire, Schlesinger hired DuBoff to negotiate the claims resulting from the losses. Similarly, it is alleged that Schlesinger agreed to pay Duboff a cash bribe in exchange for an inflated and false claim to Private Brands' insurance companies. Upon receipt of the fraudulent proofs of loss, the insurance company paid the claims in the amount of $2,510,980. The money was deposited in the account of Private Brands. Schlesinger paid Duboff the cash bribes, and Duboff distributed the cash to the other co-conspirators.

On December 31, 1998 a fourth fire (the "1998 Fire") occurred at the Premises, now doing business as Goodmark. Schlesinger hired Horizon International Group,

Ltd. ("Horizon"), a public adjusting company located in New York, New York, to represent Goodmark in connection with the insurance claims relating to that fire. On January 19, 1999, Schlesinger prepared a cost estimate from a fictitious company called "G.I.I. Engineering Co." to repair knitting machines. Schlesinger also solicited the help of defendant Herman Niederman who at the time was the President of House of Kids, Inc., a corporation located in Brooklyn, New York, which was engaged in the business of manufacturing clothing. In February 1999, Niederman, with the help of an employee of Dryesburg Corporation, provided Schlesinger with inflated quotes for fabric. Schlesinger provided Horizon with the G.I.I. Estimate and the Dryersburg Letter in support of a preliminary claim for damages totaling $4,092,319.84. Horizon prepared and submitted claims to Atlantic Mutual Insurance Company ("Atlantic Mutual").

Atlantic Mutual retained the services of Thomas J. Russo Consultants, Ltd. ("TJR Consultants"), a cause and origin expert located in Williston Park, New York, in order to examine the fire scene and determine the cause and origin of the 1998 Fire. Atlantic also retained the services of Stoner and Company, Inc. ("Stoner"), a salvor located in Bohemia, New York, to determine the amount of loss and damage to the inventory at the Premises as a result of the 1998 Fire. A salvor's responsibilities include verifying an insured's inventory counts and values submitted in support of the claim for damaged goods, and selling the damaged goods for the insurance company. TJR consultants determined that the 1998 Fire originated on the third floor shipping area of the Premises and was intentionally set. In addition, the New York City Fire Department fire marshal concluded that this fire was intentionally set and labeled the fire an arson. Further, upon arrival of the New York City

Fire Department, the building was found locked with no indication of forced entry.

The indictment charges that Schlesinger, along with John Doe # 7 whose identity is known to the grand jury, deliberately caused the 1998 Fire to be set for the purpose of submitting the false and inflated insurance claim to Atlantic Mutual totaling approximately $4,590,000 in insurance benefits. Atlantic Mutual declined to pay the claim because it concluded that the fire was intentionally set. On March 16, 2001, Schlesinger filed a lawsuit against Atlantic Mutual seeking to recover damages caused by the 1998 Fire.

On August 3, 1999, a fifth fire occurred at the Premises. Schlesinger and his brother still owned the company under the name Goodmark. Schlesinger retained the services of Horizon to negotiate Goodmark's claim with the insurance company Crum and Forster Indemnity Company. Schlesinger again allegedly submitted fraudulent documentation from co-defendant Niederman regarding the value of damaged fabrics, as well as other fraudulent documents in order to defraud the insurance company. After receiving the proof of loss, the insurance company paid the claim in the amount of $934,319. The funds were deposited into the Goodmark bank account.

### B. The Alleged Creditor Fraud Scheme

#### 1. Private Brands

In September of 1996, Private Brands had substantial financial obligations to various lien and judgment holders and creditors (collectively "creditors"). These obligations included: New York State and New York City tax judgments in excess of $630,000; an Internal Revenue Service lien in excess of $570,000; a bankruptcy court judgment in excess of $1,200,000; a civil suit with a potential judgment in excess of $250,000; and a debt to Brooklyn Union Gas Co., for approximately $75,000.

In 1987, the French American Bank ("FAB") issued a revolving line of credit to Private Brands in the amount of $2,000,000, which was collateralized by certain assets, including machinery, equipment, and inventory. In July 1996, Schlesinger and others, arranged for and caused C.C. Calabria, Inc. ("Calabria"), a real estate holding company, to purchase the loan Private Brands owed to FAB. Schlesinger allegedly hired an attorney, Edwin Schwimmer, to create a paper trail to make it appear as though Calabria did in fact purchase the FAB loan. However, Schlesinger provided the funding for Calabria to assume the loan, making it falsely appear as if Calabria was an independent purchaser of the FAB loan. A substantial portion of the funding came from a company known as Selective Properties, Inc.

After Calabria obtained the loan from FAB, Schlesinger and others arranged for Calabria to foreclose on the FAB loan and obtain title to all assets of Private Brands through public auction, effectively making Private Brands judgment proof. In September of 1998, following the transfer, Calabria leased the equipment to Goodmark, which was operating an identical business as Private Brands, in the same location, controlled by Schlesinger and his brother. The Government alleges that Calabria's principal had nothing to do with any of the foregoing transactions and would sign documents at the direction of Schlesinger. Edwin Schwimmer, the attorney representing Calabria, stated that he never spoke with anyone other than Schlesinger regarding the transaction and any signatures required for the transaction were provided by Schlesinger.

It is further alleged that Schlesinger, along with others, made false representa-

tions to Atlantic Mutual regarding Private Brands collateral purportedly damaged in the 1998 Fire. Specifically, Schlesinger represented that the collateral was owned by Goodmark, which was the named insured on the Atlantic Mutual policy. Schlesinger supported these misrepresentations by forwarding documents relating to Calabria's assumption of the FAB loan and the subsequent foreclosure sale of the collateral to Goodmark.

Allegedly, Schlesinger made it appear as if Private Brands and Goodmark were unrelated entities by placing nominees in official positions at Goodmark, including the defendant Niederman as secretary. In fact, Schlesinger and his brother were at all times in control of both Private Brands and Goodmark. Using the name "Pollack," Schlesinger attempted to avoid collection of the $75,000 debt owed by Private Brands to Brooklyn Union Gas by falsely representing that Goodmark was unrelated to Private Brands. This same false representation was made in letters signed in the name of Niederman as secretary of Goodmark.

### 2. Goodmark

As of September 2000, Goodmark had substantial financial obligations to various lien and judgment holders including: New York State tax judgments in excess of $50,000; a debt of approximately $162,000 owed to Jordan Yarns, Inc.; a debt of approximately $35,000 owed to Metromedia Energy, Inc.; a debt of approximately $24,000 owed to Econnergy Energy Company, Inc.; and a debt of approximately $20,000 owed to Heller Financial (collectively "creditors").

Schlesinger and Goodmark, together with others, allegedly executed fraudulent transactions. designed to make it falsely appear to the Goodmark creditors that title to certain assets of Goodmark had been conveyed to Western Industries, Inc. ("Western Industries"), a corporation formed by Schlesinger and located at 263 Classon Avenue, Brooklyn, New York. This was done to make Goodmark appear to be judgment proof.

In September 1998, Bank of America ("BOA") issued a revolving line of credit to Goodmark in the amount of $1,500,000. The BOA loan was collateralized by certain Goodmark assets, including Private Brands collateral obtained from Calabria, machinery, equipment and accounts receivable. In August 2000, Schlesinger hired attorney Stephen Einstein to represent Western Industries and negotiate an assumption of the debt owed by Goodmark to BOA in the amount of $750,000. Schlesinger provided the funding for Western Industries to assume the BOA debt, making it falsely appear as if Western Industries was an independent purchaser of the loan. Approximately $450,000 of the funding provided to Western Industries consisted of checks that had been issued to Goodmark by its customers and deposited into an escrow account maintained by the attorney's law firm. Approximately $250,000 of the funding provided by Schlesinger to Western Industries consisted of a check from Sweater Brands, Inc., a company operated by a coconspirator whose identity is known to the grand jury.

In October 2000, Schlesinger arranged for Western Industries to foreclose on the BOA loan and obtain title to the Goodmark collateral through public auction. In August 2001, Schlesinger caused the Goodmark collateral to be sold by Western Industries at a public auction conducted by Kostar Industries, Inc., located at 555 Broadhollow Road, Melville, New York. The net proceeds of the auction totaled approximately $45,000 and were deposited into the account of Western Industries. Schlesinger then caused two checks total-

ing $45,000 to be issued from the Western Industries account made payable to Sweater Brands, Inc.

## DISCUSSION

### I. Motion to Dismiss

#### A. The Statute of Limitations Defense as to the Conspiracy Alleged in Count One

In Count One of the Indictment, Schlesinger is charged with conspiring to defraud various insurance companies, in violation of 18 U.S.C. § 371, by submitting fraudulently inflated claims for loss resulting from fires occurring at his clothing manufacturing businesses in 1987, 1990, 1991, 1998, and 1999. Schlesinger argues that each fraudulent insurance claim must be treated as multiple conspiracies, rather than one ongoing conspiracy, which would result in the fraudulent claims submitted regarding the 1987, 1990, and 1991 fires being time-barred by the statute of limitations.

The applicable statute of limitations for an action brought under § 371 is five years. 18 U.S.C. § 3282. "In order for the conspiracy charge alleged in Count [One] to fall within the statute of limitations, (1) the conspiracy must still have been ongoing within the five year period preceding the indictment, and (2) at least one overt act in furtherance of the conspiratorial agreement must have been performed within that period." *U.S. v. LaSpina,* 299 F.3d 165, 173 (2d Cir.2002) (quotations omitted); *see also Grunewald v. United States,* 353 U.S. 391, 396–97, 77 S.Ct. 963, 1 L.Ed.2d 931 (1957); *United States v. Ben Zvi,* 242 F.3d 89, 97 (2d Cir.2001). In this case, the Superseding Indictment was the first indictment to allege a conspiracy relating to the fires that occurred before 1998. This indictment was returned on October 1, 2003 and

therefore, the conspiracy must have continued until at least October 1, 1998.

In this case, the Indictment alleges that Schlesinger and his brother, along with various co-conspirators, were engaged in a single ongoing conspiracy in which they agreed to file fraudulently inflated insurance claims. The important question here is whether each fraudulent claim was a completed conspiracy, which does not continue the conspiracy for statute of limitations purposes, or whether each claim was the continuation of a single conspiracy. "Whether the Government has proven the existence of the conspiracy charged in the indictment and each defendant's membership in it, or instead, has proven several independent conspiracies is a question for a properly instructed jury." *U.S. v. Sattar,* 314 F.Supp.2d 279, 311 (S.D.N.Y. 2004); *see United States v. Johansen,* 56 F.3d 347, 350 (2d Cir.1995); *United States v. Trippe,* 171 F.Supp.2d 230, 238 (S.D.N.Y.2001); *U.S. v. Vondette,* 248 F.Supp.2d 149, 162 (E.D.N.Y.2001); *see also U.S. v. Berger,* 224 F.3d 107, 114 (2d Cir.2000) (stating that whether a single conspiracy or multiple conspiracies exist is a question of fact for a properly instructed jury).

Here, the Indictment sufficiently alleges one conspiracy coming within the five year statute of limitations. The Indictment states:

> The defendant, NAT SCHLESINGER, together with others, devised and executed a scheme to defraud insurance companies by submitting and causing to be submitted false and inflated insurance claims ... seeking a total of approximately $9,000,000 in insurance benefits to cover losses purportedly caused by fires at the Premises in 1987, 1990, 1991, 1998 and 1999.

Superseding Indictment ¶ 18.

"[A] single conspiracy is not transposed into a multiple one simply by

lapse of time, change in membership, or a shifting emphasis on its locale of operations." *U.S. v. Aracri,* 968 F.2d 1512, 1521 (2d Cir.1992) (quoting *United States v. Nersesian,* 824 F.2d 1294, 1303 (2d Cir. 1987)). Furthermore, "a single conspiracy is not transformed into multiple conspiracies merely by virtue of the fact that it may involve two or more phases or spheres of operation, so long as there is sufficient proof of mutual dependence and assistance." *Aracri,* 968 F.2d at 1521 (quoting *U.S. v. Maldonado–Rivera,* 922 F.2d 934, 962 (2d Cir.1990)).

Count One of the Indictment lists 34 overt acts from 1987 to 1999 covering the time period of the alleged single conspiracy. The final overt act in this conspiracy occurs on December 10, 1999 when Schlesinger allegedly deposited the proceeds of a disbursement from an insurance claim filed for losses sustained in the 1999 Fire. This act falls within the five-year statute of limitations. As such, the Indictment sufficiently alleges a single ongoing conspiracy to commit insurance fraud within the five year statute of limitations. Therefore the motion to dismiss Count One of the Indictment with regard to the statute of limitations defense is denied.

### B. The Alleged Impermissible Invasion of the Attorney–Client Privilege as to the Creditor Fraud Counts Twenty–Two through Thirty–Four

■ Counts Twenty–Two through Thirty–Four allege that the Defendants, along with others, devised and executed schemes to defraud creditors of Goodmark and Private Brands. Schlesinger argues that the Government impermissibly obtained evidence from two attorneys hired by Schlesinger and Goodmark in violation of the attorney client privilege and their Sixth Amendment right to counsel. Schlesinger

seeks dismissal of the indictment based on these grounds.

■ "Grand jury proceedings carry a 'presumption of regularity.' " *United States v. Torres,* 901 F.2d 205, 232–33 (2d Cir.1990) (citing *Hamling v. United States,* 418 U.S. 87, 139 n. 23, 94 S.Ct. 2887, 2918 n. 23, 41 L.Ed.2d 590 (1974)) (internal quotations and citations omitted). Further, " 'as a general matter, a district court may not dismiss an indictment for errors in grand jury proceedings unless such errors prejudiced the defendants.' " *Id.* (quoting *Bank of Nova Scotia v. United States,* 487 U.S. 250, 254, 108 S.Ct. 2369, 2373, 101 L.Ed.2d 228 (1988)).

Even if Schlesinger's contentions are correct, the alleged violations of the attorney-client privilege before the grand jury do not give rise to the type of Government misconduct that would require dismissal of the indictment. *See, e.g., U.S. v. Colasurdo,* 453 F.2d 585, 596 (2d Cir.1971). (holding that a preliminary hearing was unnecessary to determine whether the grand jury had heard evidence in violation of the attorney-client privilege). Whether or not the evidence is privileged is better examined in the context of the trial. "Otherwise, before trial on the merits there would always be a kind of preliminary trial to determine the competency and adequacy of the evidence before the grand jury, with resultant delay." *Colasurdo,* 453 F.2d at 596. Thus, the Court finds that under these circumstances dismissal of the indictment on this ground is unwarranted.

### C. Sufficiency of Evidence as to Arson in Count Twenty

■ It is well-settled that a federal defendant may not challenge a facially-valid indictment on the ground that it is based on insufficient evidence. *United States v. Williams,* 504 U.S. 36, 54–55, 112 S.Ct. 1735, 118 L.Ed.2d 352 (1992); *United*

*States v. Casamento,* 887 F.2d 1141, 1182 (2d Cir.1989); *U.S. v. Butler* 351 F.Supp.2d 121, 126 (S.D.N.Y.2004). Here, the defendant makes no argument that the Indictment suffers from a facial defect. Thus, the motion to dismiss Count Twenty is denied.

## II. Joinder of Offenses and Defendants

█ The Indictment charges the Defendants in two separate conspiracies, that is, the insurance fraud and the creditor fraud scheme. The Defendants argue that joinder of these conspiracies was improper, and move: (1) to sever under Fed. R.Crim.P. 8 Counts Twenty–Three to Thirty–Four of the superseding indictment from the remaining counts on the ground that joinder is improper; and (2) to sever defendant Niederman pursuant to Fed. R.Crim.P. 12(b) and 14(a) on the ground that he will be unduly prejudiced if tried jointly with Schlesinger.

### A. Rule 8(b)

█ Where, as here, defendants in a multi-defendant case challenge joinder of offenses and defendants, the motion is construed as arising under Rule 8(b). *See United States v. Turoff,* 853 F.2d 1037, 1043 (2d Cir.1988). It is well-settled that Rule 8(b) governs the joinder of two or more defendants in the same indictment. *United States v. Feyrer,* 333 F.3d 110, 113 (2d Cir.2003). Rule 8(b) states:

> The indictment or information may charge 2 or more defendants if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses. The defendants may be charged in one or more counts together or separately. All defendants need not be charged in each count.

Fed.R.Crim.P. 8(b).

█ The effect of analyzing joinder of multiple defendants and counts under Rule 8(b), rather than 8(a), ensures that multiple defendants are only tried together if "the charged acts are part of a series of acts or transactions constituting an offense or offenses." *Turoff,* 853 F.2d at 1043.

In *United States v. Attanasio,* 870 F.2d 809 (2d Cir.1989), the Second Circuit interpreted Rule 8(b) to mean that the acts must be "unified by some substantial identity of facts or participants, or arise out of a common plan or scheme." *Id.* at 815 (citing *United States v. Porter,* 821 F.2d 968, 972 (4th Cir.1987)).

The Government argues that joinder of the various financial frauds is proper because all the criminal conduct arises from the defendant Schlesinger and his brother's ownership and control of several successive clothing manufacturing factories located at the same Premises. In addition, all of the conduct involves the defendant and his brother masking their ownership and control of their various entities through the use of nominee principals and companies to commit their financial frauds. On the other hand, Schlesinger argues that the creditor fraud allegations are clearly separate and distinct from the insurance fraud count and that the two schemes bear no relationship to each other. In support of this contention, Schlesinger points out that the parties are not the same and that judgment creditors are nowhere to be found in the insurance fraud and arson counts.

While it is true that the two schemes bear little resemblance to each other, the Court finds that the schemes are linked by a substantial identity of facts and participants. All of the Defendants—Schlesinger, Niederman, and Goodmark—are charged in both schemes. In addition, as the Government points out, the two conspiracies both arise from the Defendants

efforts at masking the fact that Schlesinger and his brother owned and controlled each of the clothing manufacturing businesses located at the Premises. Niederman's participation as Schlesinger's nominee with regard to Goodmark, which masked the identity of the true owners, was critical to both schemes. In addition, Niederman played a substantial role in the insurance fraud by submitting a false quote on fabric from Dryersberg. There is, therefore, a substantial identity of facts and participants.

### B. Rule 14

Even if the Defendants are properly joined under Rule 8(b), a defendant may move for severance under Rule 14, which provides in relevant part:

> If it appears that a defendant or the government is prejudiced by a joinder of offenses or of defendants in an indictment or information or by such joinder for trial together, the court may order an election or separate trials of counts, grant a severance of defendant or provide whatever justice requires.

Fed.R.Crim.P. 14

 Under this rule, the decision to sever a joint trial "is committed to the sound discretion of the trial judge." *United States v. Blount*, 291 F.3d 201, 209 (2d Cir.2002). There is a preference in the federal system for joint trials of defendants who are indicted together, *Zafiro v. United States*, 506 U.S. 534, 537, 113 S.Ct. 933, 122 L.Ed.2d 317 (1993), and the Court should sever trials of co-defendants under Rule 14 only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or lack of guilt. *Id.* at 539, 506 U.S. 534, 113 S.Ct. 933, 122 L.Ed.2d 317; *United States v. Rahman*, 189 F.3d 88, 122 (2d Cir.1999). Even if

prejudice is shown, Rule 14 does not require severance. *See United States v. Haynes*, 16 F.3d 29, 32 (2d Cir.1994). Rather, "limiting instructions often will suffice to cure any risk of prejudice." *Zafiro*, 506 U.S. at 539, 113 S.Ct. 933, 122 L.Ed.2d 317.

Niederman advances several arguments in favor of severance. First he argues that there is a risk that a jury would find "guilt by association" because both defendants are Hasidic Jews in the clothing manufacturing business. Second, he argues that there is a disparity in the amount of evidence against him as compared to Schlesinger, and that such disparity in a complex case will confuse the jury. Finally, he argues that there will be antagonistic defenses raised at the trial.

 Niederman's argument that the jury could find "guilt by association" merely because the two defendants are Hasidic Jews is unavailing. In *U.S. v. Loalza–Vasquez*, 735 F.2d 153, 159 (5th Cir.1984), the United States Court of Appeals for the Fifth Circuit held that the district court did not abuse its discretion when it decided not to sever Spanish speaking defendants who all had Spanish surnames and similar appearances. The Fifth Circuit reasoned that the defendants were represented by different counsel; that the district court helped the jury distinguish the defendants; and that the district court gave limiting instructions prior to the introduction of the similar offense evidence and in the charge to the jury. *Id.; see, e.g., U.S. v. Berger*, 22 F.Supp.2d 145, 155 (S.D.N.Y.1998) (denying motion to sever the trial of two Hasidic Jews). Here, the Court finds that these same protections against such "guilt by association" will be available at trial to protect Niederman from confusion with Schlesinger.

Second, the fact that Schlesinger and Niederman may have different degrees of guilt or face varying amounts of evidence does not require separate trials. *See United States v. Locascio*, 6 F.3d 924, 947 (2d Cir.1993) ("[J]oint trials involving defendants who are only marginally involved alongside those heavily involved are constitutionally permissible."); *see also United States v. Hernandez*, 85 F.3d 1023, 1029 (2d Cir.1996) ("The fact that one of several codefendants is tried for a crime not committed by another codefendant does not, without more, create the sort of miscarriage of justice that would require a new trial.").

Finally, Niederman argues that the Defendants have antagonistic defenses. Niederman contends that his theory of defense is that he did not sign the letters and documents relating to the conspiracies, whereas Schlesinger seeks to point the finger at Niederman. "A trial need not be severed simply because codefendants raise conflicting defenses." *U.S. v. Blount*, 291 F.3d 201, 209 (2d Cir.2002); *see, e.g., Zafiro*, 506 U.S. at 538–39, 113 S.Ct. 933, 122 L.Ed.2d 317. In fact, it seems likely that the jury would better understand each defendants' defense if presented at the same trial, rather than separate trials that might lead to conflicting interpretations of the same documents and evidence.

Moreover, it appears likely that the evidence at trial against each of the defendants is necessarily interrelated. According to the Government, proof of one scheme is indispensable for a full understanding of the other charged scheme, as well as the charged criminal enterprise as a whole. Niederman is an integral part of both schemes. Thus, severance would only result in the repetition of evidence that would have been admissible in any case against each of the defendants at a joint trial. *See United States v. Rosa*, 11 F.3d 315, 341 (2d Cir.1993) ("Evidence at the joint trial of alleged co-conspirators that, because of the alleged conspiratorial nature of the illegal activity, would have been admissible at a separate trial of the moving defendant is neither spillover nor prejudicial."); *United States v. Muyet*, 945 F.Supp. 586, 596 (S.D.N.Y.1996) ("[E]ven if the Court were to grant severance, much of the evidence regarding ... codefendants' acts of violence would be admissible in ... [their] trial as proof of the existence and nature of the conspiracy.").

The Court finds that severance is not necessary in this case. To the extent that the evidence against one defendant may not relate to another, the Court will either redact or issue limiting instructions to cure any possible prejudice. *Zafiro*, 506 U.S. at 539, 113 S.Ct. 933, 122 L.Ed.2d 317. The Court will give appropriate limiting instructions to the jury, directing the jurors to consider the evidence as to each count of the Indictment and as to each defendant separately and that a verdict of guilty as to any defendant on any count should not in any way control the jury's verdict as to any other offenses charged. Similarly, to the extent that some of the evidence relating to arson may not relate to Niederman, the Court is still of the opinion that the jury will be able to separately evaluate the evidence, particularly following the limiting instructions. *Id.* Indeed, the Second Circuit has held that a multi-defendant trial is not beyond the "ken of the average juror." *United States v. Villegas*, 899 F.2d 1324, 1347 (2d Cir.1990).

In sum, the Court finds that Schlesinger and Niederman have not demonstrated the existence of a serious risk that a joint trial will compromise a specific trial right or will prevent the jury from making a reliable judgment about guilt or lack of guilt. *Zafiro*, 506 U.S. at 539, 113 S.Ct. 933, 122

L.Ed.2d 317; *Rahman*, 189 F.3d at 122. Accordingly, their request for severance pursuant to Rule 14 is denied.

## III. Bill of Particulars

■ Schlesinger seeks a written bill of particulars on Counts One through Thirty-Four, claiming that the Indictment is too general to afford Schlesinger the opportunity to know the specific acts that he is accused of. Rule 7(f) "permits the defendant to seek a bill of particulars in order to identify with sufficient particularity the nature of the charge pending against him, thereby enabling [the] defendant to prepare for trial, [and] to prevent surprise...." *United States v. Bortnovsky*, 820 F.2d 572, 574 (2d Cir.1987); *United States v. Oskowitz*, 294 F.Supp.2d 379 (E.D.N.Y.2003).

■ To obtain a bill of particulars, the defendant must show that the charges of the indictment are so general that they do not advise him of the specific acts of which he is accused. *See United States v. Torres*, 901 F.2d 205, 234 (2d Cir.1990); *United States v. Walsh*, 194 F.3d 37, 47 (2d Cir.1999). The decision to grant or deny a defendant's request for a bill of particulars is within the sound discretion of the trial court. *United States v. Panza*, 750 F.2d 1141,1148 (2d Cir.1984).

As the Second Circuit has stated in *Torres:*

> The function of a bill of particulars is to provide defendant with information about the details of the charge against him if this is necessary to the preparation of his defense, and to avoid prejudicial surprise at the trial. A bill of particulars should be required only where the charges of the indictment are so general that they do not advise the defendant of the specific acts of which he is accused. Whether to grant a bill of particulars rests within the sound dis-

cretion of the district court. Acquisition of evidentiary detail is not the function of the bill of particulars. So long as the defendant was adequately informed of the charges against him and was not unfairly surprised at trial as a consequence of the denial of the bill of particulars, the trial court has not abused its discretion.

*Torres*, 901 F.2d at 234 (quotations and citations omitted).

The Court finds that the Indictment is sufficiently specific as to the essential elements of the allegations charged in the Indictment. Accordingly, the motion for a bill of particulars is denied.

## IV. Motion to Suppress Evidence

Schlesinger has alleged that "one particular tape" that the Government will introduce at trial contains evidence showing that the Government was involved in, or acquiesced to a private citizen breaking into Schlesinger's office and stealing that tape in order to turn it over to the Government. The Government was unable to respond to Schlesinger's motion because it claims that none of the agents assigned to the case are familiar with such an event. As such, the Court cannot determine whether the tape is admissible. Schlesinger may renew this motion when the tape can be sufficiently identified by the parties.

## V. Location of the Trial

The Jurisdiction of the Eastern District of New York comprises the counties of Kings (also known as "Brooklyn"), Queens, Richmond (also known as "Staten Island"), Nassau, and Suffolk. 28 U.S.C. § 112. Under the Court's Guidelines for the Division of Business Among Judges ("Guidelines"), adopted pursuant to 28 U.S.C. § 137, cases are assigned to one of the two

federal courthouses located in the District. One courthouse is located in Brooklyn, New York, while the "Long Island" Courthouse is located in Central Islip, New York. Both Courthouses can properly exercise jurisdiction over a case filed in the District. *See* 28 U.S.C. § 112(c). The Guidelines state that a criminal case shall be designated a "Long Island case"—and assigned to the Long Island Courthouse—if the crime was allegedly committed wholly or in substantial part in Nassau or Suffolk County. Cases shall be tried in the place it has been assigned except for an emergency.

Section 50.2(f) of the Guidelines permits a party to object to the designation of a judge or to the place of trial in a criminal case, within ten days from arraignment or from initial notice of appearance, whichever is earlier. However, the "rules are not intended to give the parties a right to litigate where a particular case will be tried, but merely provide the guidelines by which the Eastern District administratively handles and assigns its cases." *United States v. Garces*, 849 F.Supp. 852, 861 (E.D.N.Y.1994); *see also U.S. v. Astra Motor Cars*, 352 F.Supp.2d 370, 372 (E.D.N.Y. 2005); *United States v. All Funds on Deposit in Bus. Money Mkt. Account No. 028-0942059-66*, 319 F.Supp.2d 290, 293 (E.D.N.Y.2004).

Here, Schlesinger objects to this case being designated a "Long Island Case" and tried in the Central Islip Courthouse. Schlesinger argues that the case has virtually no connection to Long Island and requests that the case be transferred to the Brooklyn Courthouse. In addition, Schlesinger argues that transfer is necessary in this case because there may be a viable challenge to the fair cross section of jurors available in the Long Island Courthouse. Schlesinger contends that "virtually all" of the Hasidic Jews live in Brooklyn. As

discussed below, Schlesinger's arguments are without merit.

 As an initial matter, the Court notes that Schlesinger's motion to change venue, dated February 11, 2005, is time-barred under the Guidelines. Schlesinger was arraigned in the Long Island Courthouse on October 9, 2003. However, to the extent that counsel for the defendant has just recently appeared in the case, the Court will address the substance of his request.

 Schlesinger is correct to note that a majority of the events that gave rise to this case took place in Brooklyn, and that the Defendants reside in Brooklyn. However, there are sufficient connections to Long Island in this case. The Government contends that the Indictment arose out of prior investigations of the insurance industry on Long Island. In addition, the pending Indictment contains allegations regarding mailings in furtherance of the criminal conspiracy to Suffolk County. DuBoff, One of the first conspirators in the insurance fraud scheme, operated his public adjusting firm out of Valley Stream, New York, which is located in Nassau County. In addition, the Court notes that the Indictment alleges that Schlesinger sold the Goodmark collateral at an auction held in Melville, New York, which is located in Suffolk County. Therefore, the Indictment clearly alleges that crimes were committed in substantial part in Suffolk County.

 As for Schlesinger's contention that he will have a viable challenge to the jury selection process, the Court finds this contention speculative and without merit.

In order to establish a prima facie violation of the fair-cross-section requirement, the defendant must show (1) that the group alleged to be excluded is a "distinctive" group in the community;

(2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.

*Duren v. Missouri*, 439 U.S. 357, 364, 99 S.Ct. 664, 668, 58 L.Ed.2d 579 (1979).

 Jewish persons are a cognizable group for purposes of the first prong of the fair-cross-section requirement. *U.S. v. Gelb*, 881 F.2d 1155, 1161 (2d Cir.1989). But Schlesinger has a formidable task in proving the last two prongs. The much more restrictive previous Eastern District Jury Plan, which provided for a separate master jury wheel for trials in the Long Island Courthouse that included only residents of the two Long Island counties, withstood intense scrutiny. *U.S. v. Miller*, 116 F.3d 641, 656 (2d Cir.1997); *In re Jury Plan of Eastern District of New York*, 27 F.3d 9, 9–10 (2d Cir.1994) (outlining history of the Eastern District's jury selection plans).

The current Jury Plan makes no distinction between the jury pool available for Long Island cases and Brooklyn cases. Juror names for grand and petit jurors are selected at random from the voter registration lists of all the five counties within the Eastern District of New York, Kings, Queens, Richmond, Nassau, and Suffolk, supplemented by lists for these counties from the New York State Department of Motor Vehicles and other lists for the five counties. Schlesinger's argument that statistics will demonstrate that Long Island panels are predominately made up of Long Island residents, and therefore devoid of Hasidic Jews, is speculative and cannot justify a change of venue at this time. There is no reason to believe that Hasidic Jews, whether they reside in Brooklyn or Long Island, would not be called for service on this jury. Therefore, the Defendants request to change the location of the trial to Brooklyn, New York is denied.

## CONCLUSION

Having reviewed the submissions of the parties, it is hereby

**ORDERED,** that the Defendants' motion to dismiss Count One, Twenty, and Twenty–Two through Thirty–Four of the Superseding Indictment is DENIED; and it is further

**ORDERED,** that the Defendants' motion to sever the trials of Counts Twenty–Three through Thirty–Four from the remaining Counts is DENIED; and it is further

**ORDERED,** that Niederman's motion to sever his trial from that of his co-defendants is DENIED; and it is further

**ORDERED,** that the Defendants' motion to grant a bill of particulars is DENIED; and it is further

**ORDERED,** that the Defendants' motion to suppress evidence is DENIED at this time, without prejudice; and it is further

**ORDERED,** that Schlesinger's motion to transfer the location of the trial is DENIED.

**SO ORDERED.**